were contemplating a large layoff of otherwise eligible employees.

The fiduciary duties applicable to the Severance Plan are set out in 29 U.S.C. § 1104(a)(1). This section provides that:

. . . a fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and—

(A) for the exclusive purpose of:

(i) providing benefits to participants and their beneficiaries; and

(ii) defraying reasonable expenses of administering the plan;

An amendment of the plan as alleged by plaintiff clearly violates this fiduciary duty. The fiduciaries are to guard the interests of the participants and beneficiaries, not those of the employer.

Defendants' contention that they could terminate the plan at any time and take back the accumulated assets is also in direct conflict with 29 U.S.C. § 1103(c)(1). This section provides that:

Except as provided in paragraph (2) or (3) or subsection (d) of this section, or under sections 1342 and 1344 of this title (relating to termination of insured plans), the assets of a plan shall never inure to the benefit of any employer and shall be held for the exclusive purposes of providing benefits to participants in the plan and their beneficiaries and defraying reasonable expenses of administering the plan.

ERISA is a statute designed to protect employees' interests in benefit plans. To argue that employer may terminate such plans at any time without violating the statute is clearly not supportable in the statutory language nor in equity. Defendants' motion for summary judgment as to Counts III and IV of plaintiff's complaint will, therefore, be denied.

Defendants' last two motions for summary judgment are directed to Counts I and II of plaintiff's complaint. These counts seek declaratory and injunctive relief with respect to the Employee's Death Benefit Plan, which plaintiff alleges that defendants do not intend to honor. Defendants move for summary judgment on the grounds that plaintiff's allegations show, as a matter of law, that plaintiff did not qualify for benefits under the plan. Defendants rely on a summary and description of the plan included as an exhibit to plaintiff's complaint. In this exhibit, it is stated that an employee does not qualify until he has worked five years from the date of adoption of the agreement. It is undisputed that plaintiff did not work such a period for Falstaff.

The actual agreement is also an exhibit to plaintiff's complaint, though. In this agreement it is stated that an employee qualifies after five years of employment, disregarding the date of adoption of the agreement. Plaintiff worked more than five years for Falstaff. The actual agreement obviously prevails over conflicting language contained in a summary and description. Defendants' motions as to these counts will therefore be denied.

**Dr. J. D. BROMHALL**

v.

**David M. RORVIK and J. B. Lippincott Company.**

**Civ. A. No. 78–2297.**

United States District Court, E. D. Pennsylvania.

Oct. 1, 1979.

Daniel J. Ryan, Peter Hearn, Philadelphia, Pa., for J. B. Lippincott.

Stephen A. Cozen, Philadelphia, Pa., for David M. Rorvik.

Arthur G. Raynes, Philadelphia, Pa., for plaintiff.

## MEMORANDUM AND ORDER

FULLAM, District Judge.

In January 1978, the defendant J. B. Lippincott Company ("Lippincott") published a book authored by the defendant Rorvik entitled *In His Image,* subtitled *The Cloning of a Man.* The book purports to be a factual account of a successful experiment, conducted in great secrecy, resulting in the creation of a human genetic "twin" by cloning.[1]

Plaintiff is an eminent British scientist, a recognized authority in the field of experimental embryology. He asserts that the book is a hoax and has brought this action to recover damages for libel, malicious invasion of privacy, and infringement of common law copyright, and to obtain equitable relief. The defendant Rorvik has moved to dismiss for lack of personal jurisdiction, and the defendant Lippincott has filed a Motion to Dismiss which will be treated as a Motion for Summary Judgment.

### I. JURISDICTION AS TO THE DEFENDANT RORVIK

Plaintiff is a citizen and resident of Great Britain. Defendant Rorvik is a citizen and resident of the State of Montana. Rorvik resided variously in California and Montana while writing the book. His dealings with the publisher, Lippincott, were handled for the most part through Rorvik's literary agent whose office was in New York City. The agreement between author and publisher was signed by Rorvik in New York, and by Lippincott in Philadelphia.

For the most part, Rorvik's agent dealt directly with Lippincott's New York office, which was responsible for all editorial work in connection with the book. However, Lippincott's principal place of business is in Philadelphia, and the book was printed in Bloomsburg, Pennsylvania, and bound in

---

1. As readers of science fiction are well aware, the term "clone" refers to asexually produced offspring, that is, produced by a process of cell-division which does not begin with the union of two sex cells. A clone would be the genetic twin of the cell donor. Propagation of plants by this method is, of course, commonplace, but mammalian reproduction in this fashion would indeed be a revolutionary accomplishment, with profound and disturbing implications.

Scranton, Pennsylvania. The dust jacket was designed by Lippincott's art department in Philadelphia.

Rorvik himself traveled to Philadelphia twice in connection with the book, once to review page proofs, and on a second occasion to appear on two television programs and to be interviewed by two daily newspapers, in connection with promotion of the book.

■ There is therefore, in my judgment, no merit to defendant Rorvik's contention that assertion of *in personam* jurisdiction by this Court, pursuant to Pennsylvania's long-arm statute, 42 Pa.C.S.A. §§ 5321 *et seq.* would be unconstitutional. The circumstances outlined above more than satisfy the minimal contacts required by the due process clause. Pennsylvania is plainly an appropriate forum for litigation against the author of allegedly defamatory material published within the State.

■ The defendant Rorvik asserts that service of process upon him was ineffective. The applicable statute, 42 Pa.C.S.A. § 5323 provides:

"(a) *Manner of Service.*—When the law of this Commonwealth authorizes service of process outside this Commonwealth, the service, when reasonably calculated to give actual notice, may be made:

. . . . .

"(3) [b]y any form of mail addressed to the person to be served and requiring a signed receipt.

"(b) . . . When service is made by mail, proof of service shall include a receipt signed by the addressee *or· other evidence of personal delivery to the addressee satisfactory to the tribunal."* (Emphasis supplied.)

A copy of the Complaint was sent by certified mail to the defendant at the Montana address listed as his residence on the records of the Montana Department of Motor Vehicles, and on real estate tax records. The marshal's return notes, "Defendant's copy returned by the P. O. Department marked refused." It is a reasonable infer-ence that the defendant himself, or someone authorized by him, refused to accept the communication; at least, the defendant has made no attempt to challenge that inference.

Be that as it may, it is clear, from Rorvik's own affidavit, that he had notice of this action and had been furnished a copy of the Complaint by his attorney, not later than August 15, 1978. Thus, while I very much doubt that a defendant can frustrate the service-by-mail provisions of the Pennsylvania statute by the simple expedient of refusing to accept the mail, I need not decide that question. This record contains ample "other evidence of personal delivery to the addressee" which is "satisfactory to [this] tribunal."

The defendant Rorvik's Motion to Dismiss will be denied.

## II. DEFENDANT LIPPINCOTT'S MOTION TO DISMISS

For purposes of disposing of the motion filed by defendant Lippincott, it must be assumed, as alleged by the plaintiff, that the book *In His Image, the Cloning of a Man* is an elaborate hoax, perpetrated by both defendants for pecuniary gain. The question remains, whether any actionable wrong has been done this plaintiff.

From plaintiff's standpoint, the facts may be summarized as follows: Plaintiff is, as mentioned above, a distinguished scientist who is a recognized authority in the field of experimental embryology. His (unpublished) doctoral thesis at Oxford University is entitled "An Investigation of Nuclear Transplantation in the Mammalian Egg," and is an account of his extensive original research and experimentation involving the use of "both micro-injection and virally-induced cell fusion to transfer body-cell nuclei into unfertilized rabbit eggs."

The defendant Rorvik is a free-lance reporter who has written extensively on medical and scientific subjects. In 1977, in the course of writing *In his Image,* Rorvik wrote to plaintiff, seeking information about the current status of plaintiff's work

in the field. The ostensible purpose of the inquiry was to aid Rorvik in the preparation of a serious article or book surveying the current status of scientific research in the field of cell-transplantation. In response to this inquiry, plaintiff sent Rorvik, among other things, a nine-page, previously unpublished, summary of his doctoral thesis.

In his book, Rorvik describes the successful cloning as having occurred in 1976, by scientists whose identity must be kept secret, and who therefore are referred to in the book as "Paul" and "Darwin." At pages 179–180 of the book, the following appears:

"Darwin said that the makeup of the medium in which the nuclei were briefly deposited prior to swift fusion with egg cytoplasm was of utmost importance. Paul and he had made some discoveries related to some of the proteins and enzymes contained in eggs and embryos. These, too, had furthered the work and might prove very useful in work unrelated to cloning as well.

"Darwin, who by this time had enjoyed at least three glasses of wine, said that in his opinion no one would match his accomplishments for another 10 years, at least. Then, embarrassed a bit by his own immodesty, he added that this would be so partly because others would be afraid to try.

"As a matter of fact, however, before the year was out we would learn of the work of an Oxford scientist who had gone, if not 'straight for the throat,' then in at least an only slightly wavering line. This researcher reported in *Nature* that he had activated rabbit eggs with cold shock, used Sendai virus to fuse them with rabbit body cells, and had achieved, out of numerous efforts, four embryos that divided regularly at normal rates all the way to the morula stage, at which point they might conceivably have been successfully implanted, had the researcher been prepared to go that far."

At this point, a footnote (32) identifies plaintiff as the Oxford scientist referred to and sets forth at great length and in detail the techniques employed by plaintiff in his research, and the results of his experiments.

Also included in the book is a bibliography which lists some 18 "unsigned reports" and approximately 219 "signed reports and books" (including 17 by Rorvik himself). This bibliography lists plaintiff's doctoral thesis, a 1975 article by plaintiff in *Nature* magazine, and a "personal communication, July 18, 1977." Only two or three other "personal communications" are listed in the bibliography.

In support of his libel claims, plaintiff asserts that the book is false and defamatory in the following respects: (1) it conveys the impression that plaintiff's own research had as its ultimate goal the cloning of human beings, and (2) it conveys the impression that plaintiff believed in and supported the scientific authenticity of the secret cloning experiment described in the book.

■ The direct references to plaintiff in the book are plainly not false, nor are they alleged to be false. However, the basic premise of the book, namely, that a human being was successfully cloned, is (at least for present purposes) false. But accurate statements about the plaintiff do not become libelous merely because they are included in a book which is false in other respects.

I shall assume, as have both parties, that Pennsylvania law governs. The courts of Pennsylvania consistently accept the views expressed in the Restatement of Torts on this subject. *See Corabi v. Curtis Publishing Co.,* 441 Pa. 432, 273 A.2d 899 (1971); *compare* 42 Pa.C.S.A. § 8343 with Restatement Torts 2d, § 613. Section 614 of the Restatement makes clear that it is the function of the court to determine "whether a communication is capable of bearing a particular meaning." As stated in *Corabi, supra,* at p. 442, 273 A.2d at p. 904, "[p]rocedurally, it is the function of the court, in the first instance, to determine whether the communication complained of is capable of a defamatory meaning."

■ In my judgment, the words used in the publication complained of are incapable

of defamatory meaning; the innuendo ascribed to the words used is entirely unwarranted. Plaintiff simply does not have a claim for defamation.

■ It is equally clear that the plaintiff cannot maintain an action for copyright infringement. It is proper to assume, for purposes of discussion, that plaintiff had a valid common law copyright in his doctoral thesis, and also a common law copyright in the nine-page summary thereof, as a derivative work. But the 1976 Copyright Act, 17 U.S.C. §§ 101 *et seq.*, effectively abolished common law copyrights, as of January 1, 1978. Two provisions of that Act are pertinent here: 17 U.S.C. § 411(a) provides, in relevant part that ". . . no action for infringement of the copyright in any work shall be instituted until registration of the copyright claim has been made in accordance with this title." No such registration has been effected by plaintiff.

■ 17 U.S.C. § 301(a) preempts state law in connection with "all legal or equitable rights that are equivalent to any of the exclusive rights within the general scope of copyright" to the extent that "no person is entitled to any such right or equivalent right in any such work under the common law or statutes of any State." It is true that § 301(b)(2) provides an exception for "any cause of action arising from undertakings commenced before January 1, 1978," but the legislative history makes it clear that Congress intended this language to exempt "causes of action arising under State law before the effective date of the statute." H.R.No.94–1476, Copyright Act, P.L. 94–553 (U.S.Code Cong. & Admin. News, Vol. 5, 94th Cong., 2d Sess. 1976, p. 5659 at 5747). Moreover, even a literal application of the words of the statute, without regard to the legislative history, leads to the same result in this case. It is only the publication of the book which could give rise to an action for infringement, and that publication did not occur (or "commence") until after January 1, 1978.

For all of these reasons, plaintiff's copyright claims must be dismissed.

The issues are not so clear, however, with respect to plaintiff's claims for invasion of privacy and for equitable relief. While the issues are not free from doubt, I believe summary disposition of these claims is not warranted.

### A. Claims for Equitable Relief

The claim asserted in Count V of the Complaint is based upon the theory that, after fraudulently obtaining the nine-page abstract of plaintiff's doctoral thesis, as mentioned above, Rorvik appropriated plaintiff's creation, in that the experimental techniques described in the book as having been used successfully in cloning a human being "are identical to those techniques developed by plaintiff in his research and communicated to defendants by plaintiff." Plaintiff alleges that the defendants have received and will receive substantial sums of money from the book, that the unlawful and unauthorized use of plaintiff's experimental techniques has greatly enhanced the sales potential and credibility of the book; that defendants have been unjustly enriched as a result of their improper actions; and that plaintiff is therefore entitled to an accounting and payment of some portion of the proceeds derived or to be derived from publication of the book and subsidiary publication rights.

Defendant Lippincott's Motion to Dismiss makes the following arguments: (1) the allegedly misappropriated material lacks sufficient originality or concreteness to warrant protection; (2) plaintiff was adequately advised by Rorvik of the use to which the material would be put; (3) plaintiff provided the material voluntarily, and therefore consented to its use; (4) the Complaint is not sufficiently specific to meet the requirements of F.R.Civ.P. 9(b) for claims based on fraud; and (5) all of plaintiff's Count V claims come within the scope of the Copyright Act of 1976, 17 U.S.C. §§ 101 *et seq.*, and are preempted by operation of that statute. None of these arguments justifies dismissal at this stage.

■■ In order to qualify for protection under state law, a property interest in an

idea, technique or method must relate to a concept which is novel, new and concrete. *Thomas v. R. J. Reynolds Tobacco Co.,* 350 Pa. 252, 267–68, 38 A.2d 61 (1944); *Schott v. Westinghouse Electric Corp.,* 436 Pa. 279, 259 A.2d 443 (1969). However, contrary to defendant's contention, that description need not be specifically pleaded in the Complaint. *Schott v. Westinghouse Electric Corp., supra* at 293, 259 A.2d 443. The present record does not permit a ruling, as a matter of law, that the property interest asserted by plaintiff fails to meet the test.

■ In my view, to the extent (if any) that plaintiff's claims are based upon fraud, the Complaint is sufficiently specific to pass muster under F.R.Civ.P. 9(b). The assertions that Rorvik made adequate disclosure of his intended use of the material, and that plaintiff freely consented to its use raise issues of fact which cannot be decided at the present stage.

■ Finally, I am of the view that the claims asserted in Count V are not governed by the Copyright Act. Copyright protection extends only to *expression* of an idea, not the idea itself. Section 102(b) of the Act reads:

"(b) In no case does copyright protection for an original work of authorship extend to any idea, procedure, process, system, method of operation, concept, principle, or discovery, regardless of the form in which it is described, explained, illustrated, or embodied in such work."

*And see Franklin Mint Corp. v. National Wildlife Art Exchange,* 575 F.2d 62, 64 (3d Cir. 1978).

Since the claims now being considered are not entitled to protection under the Act, they are not preempted by the Act. § 301(b)(1) and (b)(3).

B. *Invasion of Privacy*

■ Section 652A of the Restatement of Torts 2d establishes four categories of invasions of the right of privacy which are actionable: unreasonable intrusion upon the seclusion of another (§ 652B); appropriation of another's name or likeness (§ 652C); unreasonable publicity given to the other's private life (§ 652D); or publicity that unreasonably places another in a false light before the public (§ 652E). Comment c under § 652A includes the following:

"(c) Thus far, as indicated in the decisions of the courts, the four forms of invasion of the right of privacy stated in this Section are the ones that have clearly become crystallized and generally been held to be actionable as a matter of tort liability. Other forms may still appear, particularly since some courts, and in particular the Supreme Court of the United States, have spoken in very broad general terms of a somewhat undefined 'right of privacy' as a ground for various constitutional decisions involving indeterminate civil and personal rights . . . Nothing in this Chapter is intended to exclude the possibility of future developments in the tort law of privacy."

Plaintiff relies upon the fourth type of invasion of privacy, that covered by § 652E:

"Publicity Placing Person in False Light

"One who gives publicity to a matter concerning another that places the other before the public in a false light is subject to liability to the other for invasion of his privacy, if

"(a) the false light in which the other was placed would be highly offensive to a reasonable person, and

"(b) the actor had knowledge of or acted in reckless disregard as to the falsity of the publicized matter and the false light in which the other would be placed."

The cause of action contemplated by this language differs from a claim of defamation in at least two respects: publicity (*i. e.,* widespread dissemination), rather than mere publication, is required; and the false statement or imputation need not be defamatory. But the imputation must still be false, and, as discussed above, the statements directly concerning plaintiff in the defendant's book cannot reasonably be interpreted as false. I therefore conclude that plaintiff's claims do not fit squarely within § 652E. The only arguably "false

light" in which plaintiff may have been placed by the publication would be if the reference in the bibliography to a "personal communication" from the plaintiff could reasonably be interpreted as an assertion that the plaintiff supported Rorvik's efforts (an interpretation which I have ruled out, above), or as an assertion that plaintiff and Rorvik were friends or colleagues. The latter proposition seems equally dubious, and, in any event, a mere claim of friendship, however false, could scarcely be regarded as "highly offensive to a reasonable person."

Upon analysis, I believe plaintiff's claims for invasion of privacy do not fit within any of the categories listed in the Restatement but do share some of the attributes of the various kinds of claims there recognized. In a sense, defendants may have given unreasonable publicity to certain aspects of plaintiff's private life (§ 652D) in that they gave wide public dissemination to the relatively private information that plaintiff's research funds had been terminated.

To some extent, defendants can be said to have appropriated plaintiff's name for their own use and benefit (§ 652C), although not precisely in the absolute sense contemplated by that section. Plaintiff's claim can be viewed as an assertion that the defendants appropriated plaintiff's name and reputation to the extent of using them to lend a false air of scholarship to Rorvik's literary efforts. To the extent that they appropriated his original ideas and laboratory techniques, the claim falls within the equitable action discussed above. But to the extent that they appropriated his name and reputation, and thereby drew him against his will into the limelight of public controversy, it may be that they invaded privacy interests entitled to the law's protection.

In this developing area of the law, I am not prepared to rule at this stage that a Pennsylvania court would refuse to recognize a tortious injury in these circumstances. I believe the issues can be better examined after fuller development of the facts. Whether plaintiff's standing in the scientific community has been adversely affected, whether plaintiff's entry into the limelight of public controversy (there is a reference in the record to Congressional hearings on the underlying issues, as a result of defendants' book) was involuntary, or a self-inflicted wound; and the degree of malice or other culpability on the part of the defendants—all these issues may bear upon the ultimate determination, and should be more fully developed before a final decision is rendered. I recognize that summary disposition is generally appropriate "at an early stage in cases where claims of libel or invasion of privacy are made against publications dealing with matters of public interest and concern . . . in order to avoid the 'chilling effect' on freedom of speech and press." *Meerapol v. Nizer,* 381 F.Supp. 29, 32 (S.D.N.Y.1974), *citing Dombrowski v. Pfister,* 380 U.S. 479, 487, 85 S.Ct. 1116, 14 L.Ed.2d 22 (1965); *Vitteck v. Washington Broadcasting Co.,* 389 A.2d 1197 (Pa.Super. 1978). But this does not mean that snap judgments should be rendered on these issues. Moreover, since this action must proceed in any event on plaintiff's claims for equitable relief relating to the alleged misappropriation of his work, the "chilling effect" argument is not of major concern in this case.

The Motion to Dismiss Count II of the Complaint will be denied.