Harvey R. MELTZER, Plaintiff,

v.

Meir ZOLLER, Mrs. Meir Zoller, Ralph E. Mitschele, Robert V. Doran, Mitschele Construction Corp., Xenco, Inc., William G. Chirgotis, Matthew R. Zito, jointly, severally and in the alternative, Defendants/Third Party Plaintiffs,

v.

William G. CHIRGOTIS and Matthew R. Zito, Third Party Defendants.

Civ. A. No. 79–3176.

United States District Court,
D. New Jersey.

Aug. 17, 1981.

Harvey R. Meltzer, pro se.

Barry L. Shapiro, Sills, Beck, Cummins, Radin & Tischman, Newark, N. J., for defendants/third party plaintiffs.

David C. Dreifuss, Lum, Biunno & Tompkins, Newark, N. J., for third party defendants.

## OPINION

WHIPPLE, Senior District Judge.

This is an action for infringement of a claimed copyright in the architectural plans for plaintiff's house in Livingston, New Jersey. Jurisdiction is invoked pursuant to 28 U.S.C. § 1338(a); the underlying action is premised on the Federal Copyright Act of 1976, 17 U.S.C. § 101 et seq. ("The 1976 Act").

The case was tried to the Court sitting without a jury during five (5) days in April and May, 1981. At the end of the plaintiff's case, defendants moved to dismiss, and the Court reserved decision. Neither defendants nor third party defendants presented witnesses. All parties submitted trial briefs and written summations, as well as proposed findings of fact and conclusions of law. After careful consideration of all the testimony, exhibits, memoranda, and oral arguments, the Court hereby adopts the following findings of fact and conclusions of law. Fed.R.Civ.P. 52(a).

## FINDINGS OF FACT

Plaintiff Harvey R. Meltzer is an attorney at law in the District of Columbia who appeared pro se in this matter. In the spring of 1977, plaintiff and his wife, who resided at that time in Maryland, contacted Doris Gelvan, a real estate agent in New Jersey, regarding the purchase of a home in New Jersey. Ms. Gelvan initially showed plaintiff and Mrs. Meltzer pre-existing homes for sale. After viewing a few resale homes, the Meltzers decided to investigate having a new home built. Thereupon, on or about June 27, 1977, Doris Gelvan brought plaintiff to meet Mr. Robert V. Doran, a defendant-third party plaintiff in this action, for the purpose of discussing the construction of a single family residence to be located in Livingston, New Jersey. Mr. Doran was the vice president of Xenco, Inc. (hereinafter referred to as "Xenco"), a New

Jersey corporation which constructs private homes, as well as vice president of Deerco, Inc., a corporation which purchases land for future sale, and Mitschele Construction Corp., a New Jersey corporation engaged in the preparation of land for the construction of homes.[1]

The Meltzers explained to Mr. Doran that they basically wanted a four bedroom, center hall colonial. Mr. Doran indicated that Xenco would commission an architect to prepare the architectural plans for the construction of plaintiff's home. At this time, the Meltzers indicated that they had only $2,000.00 to expend. Mr. Doran thereupon agreed to accept a check from the Meltzers for $500.00 payable to Xenco to defray at least a portion of the cost to Xenco for the preparation of the architectural plans should a contract between plaintiff and Xenco not be consummated. It was understood that if a contract were signed, the $500.00 would be credited toward the total purchase price; but, should a contract not be signed, Xenco would absorb the architect's fees in excess of $500.00. Accordingly, plaintiff presented Mr. Doran with a check payable to Xenco, Inc. in the amount of $500.00. Plaintiff had no further discussions with any representative of Xenco concerning the cost of the architectural plans.

Subsequently, Mr. Doran brought plaintiff, along with Mrs. Meltzer and Doris Gelvan, to the office of Matthew Zito, an architect associated with the architectural firm of William Chirgotis (hereinafter referred to as "Chirgotis"). This architectural firm operated as an independent contractor. At this meeting, Mr. Zito and the Meltzers engaged in a general consultation regarding the design and type of house in which the Meltzers were interested. Mr. Zito proceeded to prepare some schematic sketches based upon Chirgotis plans previously designed, but adjusted according to the Meltzers' stated requirements.[2]

---

1. These three corporations are also defendants and third party plaintiffs in the instant action.

2. Plaintiff had prepared "thumbnail" sketches indicating his requirements; it is uncertain,

however, when these sketches were shown to Mr. Zito. Contrary to the testimony of plaintiff's wife, Mr. Zito testified that he was not shown these sketches at the initial meeting.

One of the Chirgotis plans, a French colonial home called the Chateau Gaye, was discussed in some detail at this initial meeting, with particular reference to the front elevation. The Meltzers also indicated interest in some aspects of the Eastbrooke, another Chirgotis plan. These two plans were contained in a plan book prepared by the Chirgotis firm called "101 Custom Homes", which Mr. Zito gave to the Meltzers at some time during this initial meeting. At no time during this meeting or thereafter did plaintiff discuss with any representative of the Chirgotis firm the cost of architectural plans to be prepared in connection with the Meltzer home.

The evolution of the plans for the Meltzer home progressed during the month of July, 1977. Mr. Zito coordinated his designs with plaintiff's desires as expressed in part in plaintiff's thumbnail drawings. Plaintiff and Mr. Zito conferred on various occasions regarding plaintiff's desires, and Mr. Doran was advised of any changes made in the plans. The plans upon which construction of the Meltzer home was ultimately based incorporated Mr. Zito's work as well as suggestions of Mr. Doran, the requirements of the Meltzers as derived in part from plaintiff's sketches, and the designs of the stock plans for the Chateau Gaye and Eastbrooke, products of the Chirgotis firm.[3] Annotations to these two latter designs appear on the preliminary plans dated "7/77". Indeed, the contract between Xenco and plaintiff dated September 30, 1977 specifically states that the exterior of plaintiff's home "shall be substantially similar to a home designated the Chateau Gaye as prepared by William G. Chirgotis."

The Chirgotis firm considered the architectural plans for the Meltzer home to be stock plans; part of the inventory of architectural drawings in which the architect claims ownership and which he is free to utilize as he deems appropriate. This understanding stemmed from the practice of the architectural profession as well as the prior business dealings between the Chirgotis firm and Xenco over the course of at least fifteen years.[4] Placement of the Meltzer name in the title block on the plans where the name of the client or commissioning party, in this case, Xenco, is usually put, does not affect the superior proprietary interest of the Chirgotis architectural firm in the plans.[5]

On September 30, 1977 plaintiff entered into a contract with Xenco for the construction of a residential home located at 4 Drummond Terrace, Livingston, New Jersey. The purchase price of the Meltzer home was $140,700.00. At the time of execution of this real estate contract, the Meltzers had available only $1500.00.[6] The contract therefore provided that upon execution, the Meltzers would pay Xenco $2000.00, $500.00 of which had already been paid. An additional $12,000.00 was to be paid within two weeks. Accordingly, on the date of execution the Meltzers remitted to Xenco a check in the amount of $1500.00, but not until November 9, 1977, did they pay the additional $12,000.00.

---

3. To quote Mr. Zito: "The design (of the Meltzer home) is from my mind, through my hand, my hand and then it goes to draftspeople." (Tr. 3.14, 3–4). And later, "The Meltzer plans, yes, they came from the Chateau Gaye was the base—was the footprint that we started with." (Tr. 3.39).

4. As Mr. Zito testified on cross examination regarding the plans for plaintiff's home: "The drawings are plans I prepare, are instruments of service. And we are providing a design, with our design ideas, and the drawings after they are completed are used to construct his residence. And the drawings themselves are property of me or our firm . . . . Upon completion of the Meltzer home, yes. I would consider them another stock plan in my library plans." (Tr. 3.36, 3.40).

5. In this regard, Mr. Zito testified on cross examination that Mr. Doran had mentioned to the Chirgotis office manager that he desired the Meltzer name to be on the title block in lieu of Xenco, the commissioning party.

6. Plaintiff's wife testified that AT&T, plaintiff's employer, agreed to make available to plaintiff $50,000 to cover relocation expenses; however, the record demonstrates that this money was not available at the time the construction contract was executed.

The final design was approved by the Meltzers on November 4, 1977, upon which plaintiffs received a copy of the plans. The Chirgotis architectural firm, with full knowledge of all concerned parties, retained the originals.[7] No discussion ever took place between plaintiff and any member of the Chirgotis architectural firm concerning the ownership of the architectural plans for the Meltzer home; nor did the contract between plaintiff and Xenco contain any provision as to the exclusivity of the plans for the Meltzer home or otherwise restraining Xenco from constructing other homes similar to the Meltzer home.[8] In December of 1977, the Chirgotis firm submitted a bill to Xenco in the amount of $1,914.00 for the work performed in preparing the architectural drawings for the Meltzer home. This bill was duly paid by Xenco.[9]

On May 3, 1978, plaintiff went to settlement on the Meltzer home. Mr. Doran subsequently requested access to the Meltzer home to show prospective clients the workmanship on a finished Mitschele-Xenco product, and because the Meltzer home "was always so clean and it showed well."

(Tr. 2.6, 16–22). The Meltzers granted Doran permission and he eventually brought over approximately eight or ten couples.

On or about February, 1979, defendants Mr. and Mrs. Meir Zoller contacted Mr. Doran concerning the construction of a single family dwelling. On February 11, 1979, Mr. Doran telephoned plaintiff to request access to the Meltzer home for the Zollers, but was told that it was not convenient. Subsequently, Mr. Zoller visited plaintiff to ask if he could see the Meltzer residence, and later that same day, the Zollers were admitted into the Meltzer home.[10]

The Zollers determined to build a home for themselves in Livingston substantially similar to the Meltzer home, and invited the Meltzers to their home to advise them of this intention. Plaintiff was upset by this news and conveyed his unhappiness to Mr. Doran; nevertheless, he conceded that if certain changes in the Zoller home would be made, he had no objections. There were no discussions, however, between the Meltzers and the Zollers concerning any copyright or other proprietary interest in the architectural drawings for the Meltzer home.[11]

7. The only purpose for retaining original plans is for duplication. Mrs. Meltzer testified that during the period of construction, she discovered that every subcontractor had a copy of the plans, and that when she requested of Mr. Doran to return the plans, he advised that he would do so. She further testified that plaintiff was present on many of the occasions when these requests were made. The credibility of this testimony is undercut, however, by Uncontested Fact 30 in the Pretrial Order of December 11, 1980, which states:

30. The plaintiff cannot recall whether prior to the institution of litigation he ever requested that Xenco, or any representative thereof, return copies of any plans of the Meltzer home which might be in their possession. Litigation was not instituted until July 10, 1979.

8. Mr. Zito testified that when a client purchases a set of plans of which they seek to retain exclusive use, the Chirgotis firm would insert a paragraph in the contract with the client to the effect that the plans in question would never be reused or reproduced for another structure without the client's written consent. No contract existed between the Chirgotis firm and the Meltzers, since Xenco was the commissioning party. At the same time, the agreement between the Chirgotis firm and Xenco was an

oral contract and contained no such understanding as to exclusivity.

9. According to Mr. Zito's testimony, the Meltzer plans were stock plans, not custom plans. While the charge for custom plans is a percentage for the total cost of the home, excluding land, the charge for stock plans, such as the Meltzer plans, is determined according to an oral understanding with the developer (Mr. Doran) on an hourly fee basis times a multiplier, or two and one-half times the actual drafting cost. This fee is predicated on the assumption that the architect will be able to use the plans again.

10. Mrs. Meltzer testified that before showing her home she obtained assurances from Mr. Zoller that he would not duplicate the home. In contrast, Mr. Zoller set forth in his affidavit that no such promises or assurances were ever made to the Meltzers. (P–Exh. 19–A).

11. Mr. Zito never agreed with plaintiff or his wife not to utilize the plans for the Meltzer home for the erection of any other home; indeed the matter was never discussed. When the Court queried whether the Meltzers had ever told Mr. Zito not to use these plans, Mr. Zito responded, "No sir." (Tr. 3.28–3.29).

Again, Xenco, through Robert Doran, commissioned the architectural firm of Chirgotis to prepare the plans for the Zoller home. Mr. Doran contacted Mr. Zito and asked if he would prepare another set of plans using the plans prepared in connection with the Meltzer home, albeit with certain changes. The real estate contract between Xenco and Meir Zoller specified that:

> "A dwelling is to be erected on the subject premises, substantially in accordance with plans of William Chirgotis, architect, known as plan # 77–870, all substantial changes from said plans must be approved by purchaser." (P–12, Tr. 3.28).

Plan # 77–870 is the plan for the Meltzer home.

The final Zoller plan contained the name Xenco in the client section of the title block, with the annotation "Residence for Mr. & Mrs. Zoller" to the left of the title block. The plans required approximately seven and one-half hours of preparation by Mr. Zito. The bill to Xenco, which was for $765.00, referred to the Zoller plans as "stock plans." The Zoller plans are substantially similar to the Meltzer plans, and both are substantially similar to the plans for the Chateau Gaye.[12]

On July 10, 1979, plaintiff filed a complaint in the Superior Court of New Jersey alleging copyright infringement of the "Meltzer plans."[13] The case was dismissed on the grounds of federal preemption; sub-

sequently, plaintiff copyrighted the plans and brought suit in this Court under the Federal Copyright Act, 17 U.S.C. § 101 *et seq.* The defendants include the Zollers, Xenco, Inc., which constructed both the Meltzer and the Zoller homes; Ralph E. Mitschele and Robert Doran, president and vice president of Xenco, Inc., respectively; Mitschele Construction Co., which dug the foundations for both homes and Deerco, Inc., which initially purchased the undeveloped land for both homes.

The defendants have in turn filed third party complaints against William G. Chirgotis and Matthew Zito, alleging, among other things, breach of implied warranty of title pursuant to N.J.S.A. 12A:2–312(3), and breach of contract.[14]

## CONCLUSIONS OF LAW

The gravamen of plaintiff's suit is that defendants conspired to and indeed did copy without authorization the architectural plans for the Meltzer home in which plaintiff alone had copyrightable interest. Plaintiff claims that the copyright interest in the plans vests in him as the author by virtue of the common law work for hire doctrine. Plaintiff also claims ownership in the plans by reason of their being "original in plaintiff"; additionally, plaintiff argues that the prima facie proof of ownership of the plans established by the Copyright Registration Certificate issued in plaintiff's name has not been rebutted by defendants.

---

12. The parties do not seriously dispute the similarity of these three plans; nevertheless, there is a question as to the extent of such similarity. Plaintiff insists that the Zoller plans are identical to the Meltzer plans, which, he argues, in turn are significantly different from the Chateau Gaye plans. In contract, Mr. Zito testified that while both the Zoller and Meltzer plans derived from the same basic "footprint" of the Chateau Gaye, the two homes are not identical. As will be explained *infra*, the Court finds that the resolution of this issue is not germane to the disposition of the case.

13. In this regard, Uncontested Facts paragraphs 15 and 16 of the Pretrial Order of December 11, 1980, state:

> 15. At no time prior to the institution of litigation, did Mr. Meltzer request that the architectural firm of William G. Chirgotis

give him the original architectural drawings used in the construction of the Meltzer home.

> 16. Prior to the institution of a lawsuit in the Superior Court of New Jersey on July 10, 1979, the plaintiff had not advised Matthew R. Zito, or anybody associated with the architectural firm of William G. Chirgotis, that he claimed either exclusive ownership of the architectural drawings for the Meltzer home or a copyright thereon. *There was no discussion between the plaintiff and Matthew R. Zito, or anyone else associated with the architectural firm of William G. Chirgotis that the plans would be utilized exclusively for the Meltzer home.*

14. The direct claims by plaintiff against the third party defendants have been settled.

For the reasons which follow, this Court concludes that plaintiff does not have the authorship interest in the plans requisite for copyright protection and consequently, his cause of action must fail.

The initial issue for this Court to resolve is which law applies to plaintiff's claims; the revised Federal Copyright Act of 1976, 17 U.S.C. § 101 *et seq.*, as defendants contend, or, as plaintiff contends, the common law.[15]

The power to provide copyright protection is delegated to the Congress by the United States Constitution. Article 1, section 8, clause 8, of the Constitution grants to Congress the power "to promote the progress of science and useful arts by securing for limited times to authors and inventors the exclusive right to their respective writings and discoveries."

Copyright did not exist at common law but was created by statute enacted pursuant to this Constitutional authority. *See Mazer v. Stein*, 347 U.S. 201, 74 S.Ct. 460, 98 L.Ed. 630 (1954); *see also MCA, Inc. v. Wilson*, 425 F.Supp. 443, 455 (S.D.N.Y. 1976); *Mura v. Columbia Broadcasting System, Inc.*, 245 F.Supp. 587, 589 (S.D.N.Y. 1965), and cases cited therein.

Prior to January 1, 1978, the effective date of the revised Copyright Act of 1976, there existed a dual system of copyright protection which had been in effect since the first federal copyright statute in 1790. Under this dual system, unpublished works enjoyed perpetual copyright protection under state common law, while published works were copyrightable under the prevailing federal statute. The new Act was intended to accomplish "a fundamental and significant change in the present law by adopting a single system of Federal statutory copyright ... (to replace the) anachronistic, uncertain, impractical, and highly complicated dual system." H.R.Rep.No.94–

1476; 94th Cong.2d Sess. 129–130, reprinted in [1976] 5 U.S.Code Cong. & Ad.News 5745. This goal was effectuated through the bed-rock provision of 17 U.S.C. § 301, which brought unpublished works within the scope of federal copyright law and preempted state statutory and common law rights equivalent to copyright. *Id.* at 5745–47. Thus, under § 301(a), Congress provided that Title 17 of the United States Code, the Federal Copyright Act, preempts all state and common law rights pertaining to all causes of action which arise subsequent to the effective date of the 1976 Act, *i. e.*, January 1, 1978:

(a) On and after January 1, 1978, all legal or equitable rights that are equivalent to any of the exclusive rights within the general scope of copyright as specified by Section 106 in works of authorship that are fixed in a tangible medium of expression and come within the subject matter of copyright as specified by sections 102 and 103, whether published or unpublished, are governed exclusively by this title. Thereafter, no person is entitled to any such right or equivalent right in any such work under the common law or statutes of any State.

17 U.S.C. § 301(a).

Three general areas left unaffected by the preemption are listed in the numbered clauses of subsection (b) of Section 301. Under § 301(b)(2) the new Title 17 does not annul or limit any right or remedy under the common law or state statutes with respect to "any cause of action arising from undertakings commenced before January 1, 1978." As explicated by the Committee on the Judiciary, this exemption refers to "causes of action arising under State law before the effective date of the statute (January 1, 1978)." H.R.Rep.No.94–1476, 94th Cong., 2d Sess. 132, reprinted in [1976] 5 U.S.Code Cong. & Ad.News 5747.[16] No

---

15. It is unclear whether plaintiff relies on the common law or the Copyright Act of 1909. In view of the conclusions of this Court, however, a discussion of this issue would be academic.

16. *See also* Pub.L. No. 94–553, § 112, 90 Stat. 2600 (1976), 17 U.S.C. § 501 note, which states:

"All causes of action that arose under (the former) Title 17 (Act of 1909) before January 1, 1978 shall be governed by Title 17 as it existed when the cause of action arose." Indeed, Congress recognized that Section 301 preemption might abrogate rights which existed before the effective date of the revised Title

specific reference is made to the ambiguous phrase "undertakings commenced" in § 301(b)(2).

■ The plans created in connection with the Meltzer home were unpublished as of the effective date of the revised Title 17. Therefore, any copyright interest in these plans was initially determined by common law. Nevertheless, the plans utilized in connection with the Zoller home were not created until after the effective date of the revised Copyright Act, so that any possible cause of action for copyright infringement arose only after that date. Hence, the new Act governs this action. *Strout Realty, Inc. v. Country 22 Real Estate Corporation*, 493 F.Supp. 997, 1000 (W.D.Mo.1980); *Bromhall v. Rorvik*, 478 F.Supp. 361, 366 (E.D.Pa. 1979).[17] Any other interpretation would contravene both the letter of the statute and the intent of Congress as evidenced in the legislative history.[18]

The revised Federal Copyright Act of 1976 provides that statutory copyright in a work "vests initially in the author or authors of the work." 17 U.S.C. § 201(a). In the case of a work made for hire:

[T]he employer or other person for whom the work was prepared is considered the author for purposes of this title, and, unless the parties have expressly agreed otherwise in a written instrument signed by them, owns all of the rights comprised in the copyright. 17 U.S.C. § 201(b).

■ Not every work prepared by an independent contractor on special order or commission is considered the equivalent of a "work made for hire." Rather, the only "works made for hire" are those which fall within one of the statutory categories set forth in 17 U.S.C. § 101, and concerning which the parties enter into an express written agreement designating the work as such. As defined by Section 101, a work made for hire is:

(2) a work specially ordered or commissioned for use as a contribution to a collective work, as a part of a motion picture or other audio-visual work, as a translation, as a supplementary work, as a compilation, as an instructional text, as a test, as answer material for a test, or as an atlas, *if the parties expressly agree in a written instrument signed by them that the work shall be considered a work made*

---

17. In this regard, the Committee on the Judiciary stated:
"The preemption of rights under State law is complete with respect to any work coming within the scope of the bill, even though the scope of exclusive rights given the work under the bill is narrower than the scope of common law rights in the work might have been.
H.R.Rep. No. 94–1476, 94th Cong. 2d Sess. 131, reprinted in [1976] 5 U.S.Code Cong. & Ad. News 5747.

**17.** The First and Second Circuit courts have also implied that § 301(b)(2) should be construed as preserving rights under state law only for causes of action arising before January 1, 1978. *Burke v. National Broadcasting Co.*, 598 F.2d 688, 691 n.2 (2d Cir.), *cert. denied*, 444 U.S. 869, 100 S.Ct. 144, 62 L.Ed.2d 93 (1979); *Birnbaum v. United States*, 588 F.2d 319, 326 n.15 (2d Cir. 1978). This reading is consistent with § 301(a), the plain meaning of which is that the 1976 Act abolished by preemption common law copyright in all works eligible for copyright protection, regardless of whether the work was created before or after January 1, 1978.

**18.** Plaintiff's assertion that 17 U.S.C. § 303 serves to preserve his cause of action under

common law copyright is misguided and misconstrues the intended impact of § 301 preemption. Section 303, entitled Duration of Copyright: Works created but not published or copyrighted before January 1, 1978, provides in pertinent part that copyright in such works "subsists from January 1, 1978, and endures for the term provided by section 302." Although not specifically so stating, § 303 addresses duration of existing common law copyrights which are still valid under the new Act; it does not address the issue of when common law copyrights are preempted. Indeed, in regard to preemption, § 303 must be read in conjunction with § 301, which not only confers exclusive jurisdiction in copyright cases in federal court, but also declares that the new Title 17 preempts any common law rights except those specifically exempted, pertaining to all causes of action arising subsequent to January 1, 1978, such as the case at hand. To interpret § 303 as extending the duration of common law copyrights in unpublished works irrespective of the mandate of § 301 would render nonsensical the clear statutory language of that section and the legislative intention behind the revision of Title 17.

*for hire.* For the purpose of the foregoing sentence, a "supplementary work" is a work prepared for publication as a secondary adjunct to a work by another author for the purpose of introducing, concluding, illustrating, explaining, revising, commenting upon, or assisting in the use of the other work, such as forwards, afterwards, pictorial illustrations, maps, charts, tables, editorial notes, musical arrangements, answer material for tests, bibliographies, appendixes, and indexes and an "instructional text" is a literary, pictorial, or graphic work prepared for publication and with the purpose of use in systematic instructional activities. (Emphasis added.)

[4, 5] As a rule, "[a statutory] definition which declares what a term 'means' . . . excludes any meaning that is not stated." 2A C. Sands, Statutes and Statutory Construction § 47.07 (4th ed. Supp. 1978), cited in *Colautti v. Franklin*, 439 U.S. 379, 392–93 n.10, 99 S.Ct. 675, 684 n.10, 58 L.Ed.2d 596 (1979); *Reliable Volkswagon Sales and Service Co. v. World Wide Auto Corp.*, 216 F.Supp. 141, 143 (D.N.J.1963). In this regard, it is a well-known canon of construction that the language of the statute is the best indication of legislative intent. *Browder v. United States*, 312 U.S. 335, 61 S.Ct. 599, 85 L.Ed. 862 (1941), cited in *AFL & CIO v. Marshall*, 570 F.2d 1030, 1036 (D.C. Cir.1978). Architectural drawings are not included in the categories set forth in Section 101; and hence in accordance with the above-stated principles, do not qualify as works made for hire with the special legal consequences which flow from this designation. *May v. Morganelli-Heumann & Assoc.*, 618 F.2d 1363, 1368 n.4 (9th Cir. 1980);[19] 1 Nimmer on Copyright § 5.03(B)(2)(a) at 5–18, 5–19 (revised ed. 1981). This is true even though the 1909

Act and certain common law jurisdictions included architectural drawings within the rubric of works made for hire, for it may be presumed that Congress was aware of the prior construction of the terms in the original act, and deliberately limited the scope of the new Act to exclude architectural plans. See 1A Sands, Statutes and Statutory Construction § 22.30 at 178 (3d ed. revised 1972).

In the instant case, plaintiff argues that the architectural plans of the Meltzer home are commissioned works for hire of which he is the author. However, plaintiff may not take advantage of the works for hire doctrine of authorship since architectural plans do not fall within one of the statutorily prescribed categories of work. Nor does there exist the requisite express written agreement between plaintiff and the architect designating the architectural plans as a work made for hire. 17 U.S.C. § 101. Instead, the only agreement evidenced in the record is an oral agreement between Xenco and the architect, Mr. Zito, pursuant to which the Chirgotis architectural firm was to be the author of the plans. Accordingly, any copyright interest which exists in the plans for the Meltzer home belongs to the Chirgotis architectural firm as preparers of the plans.

Even under the common law works for hire doctrine, plaintiff is not the author of the plans for his house. At common law, the work for hire doctrine initially applied only to the employer-employee relationship, although it was expanded in some jurisdictions to include commissioned works. *See generally*, 1 Nimmer on Copyright, *supra*, § 5.03[B] at 5–12 to 5–19. And, a line of cases developed which held that the works for hire doctrine, as articulated in the 1909 Copyright Act, 17 U.S.C. § 26, applied to

---

19. The Court of Appeals in *May v. Morganelli—Heumann & Assoc.*, in determining a case of copyright infringement regarding architectural plans under the works for hire doctrine, indicated that it hesitated to apply the 1976 Act retroactively for fear of Constitutional problems. In that case, as in the instant case, application of the new Act would annul plaintiff's claims. The *May* court did not have to determine whether the new Act applied because neither party had raised the issue. Nevertheless, this Court notes that the cause of action in the *May* case arose before the effective date of the new Act, whereas in the instant case, the cause of action arose after that date. This fact changes the complexion of the case and obviates any due process concerns.

works where the parties bore the relationship of employer and independent contractor. *Brattleboro Publishing Co. v. Winmill Publishing Corp.*, 369 F.2d 565 (2d Cir. 1966), 1 Nimmer on Copyright, *supra*, § 5.03[B] at 5–13.

In such cases, whether copyright initially vested in the independent contractor preparing the work on commission or in the commissioning party always turned on the intention of the parties where such could be ascertained. If the intention of the parties was not expressly articulated, copyright was presumed to vest in the commissioning party. *Brattleboro Publishing Co. v. Winmill Publishing Co., supra*, at 567 (applying 1909 Act). This presumption was rebuttable, and evidence of custom of the industry or pattern of dealings may establish an agreement to the contrary. *May v. Morganelli-Heumann & Assoc., supra* at 1368–69; *see generally* 1 Nimmer on Copyright, *supra* § 5.03(B)(2)(c) at 5–20, 5–22.

In the instant case, there is no agreement explicitly articulating the intention of any of the parties regarding who owns any copyright interest. Accordingly, the presumption that the parties mutually intended copyright to vest in the commissioning party becomes operable absent any persuasive evidence to the contrary. The record does not establish, however, that plaintiff is the commissioning party, despite his input in the plans. To the contrary, the evidence demonstrates that it is Xenco which commissioned the architectural plans for the Meltzer house. Plaintiff never engaged in any conversation with the architectural firm of Chirgotis regarding payment for, ownership of, or copyright interest in the architectural plans in question. Rather, the Chirgotis firm considered that its services were engaged by Xenco, with which it had an oral understanding in conformity with fifteen years of prior dealings. At no time did the Chirgotis firm consider that it had a contract with the Meltzers, notwithstanding the placement of the Melt-

zer name in the title block of the plans and the control over modification in the plans that plaintiff purportedly exercised. Indeed, all monies received by the Chirgotis firm for these plans were paid by Xenco, not plaintiff. Accordingly, as it is Xenco, and not plaintiff, who is the commissioning party, plaintiff cannot establish copyright interest in the plans even under the common law or the 1909 Act.

And in any event, the presumption that copyright interest vested in the commissioning party was overcome here by evidence that the parties intended for the architect to retain copyright interest in the plans. Not only is it the custom of the architectural profession that architects retain ownership of plans unless an express agreement to the contrary exists, but also it is in keeping with the prior dealings of Xenco and the Chirgotis firm as developed over fifteen years for the architectural firm to retain ownership of the plans unless otherwise explicitly agreed. Indeed, the charge for the Meltzer house plans was predicated upon the assumption that such plans would be reusable by the architect at will. And, in accordance with this understanding, Chirgotis retained the original plans. Consequently, the presumption of ownership by the commissioning party has been overcome in favor of ownership by the architectural firm.[20]

Having determined that plaintiff may not prevail as author of the plans and therefore owner of any copyright interests therein by virtue of the work for hire doctrine in either its current statutory expression, the common law, or the pre-existing 1909 Act, the Court now turns to plaintiff's contention that he is owner of the plans as they are "original in him." Plaintiff's Trial Summary pp. 12–13. Again, this Court finds that this contention is without merit.

True, plaintiff prepared sketches illustrating in some detail features of the house which he and his wife required, and presented such sketches to the architect,

---

**20.** Of course, Xenco and Mr. Zito of the Chirgotis firm agree that the latter is the owner of the

plans for the Meltzer home.

Mr. Zito. It is also true that throughout the evolution of the plans, plaintiff contributed ideas and made certain changes and exercised approval power. But it cannot be gainsaid that the Chirgotis firm, as the architects, are the creators of the plans, and that the architectural firm designed plans and contributed most of the ideas contained therein. The home, a four-bedroom French colonial, is substantially similar to the Eastbrooke and the Chateau-Gaye, two plans designed by the Chirgotis firm and incorporated in the Chirgotis manual, "101 Custom Homes." The plaintiff does not deny this similarity, nor does he dispute that he was familiar with these two plans, and even designated them by name on the preliminary plans for his home.[21] Indeed, Mr. Zito testified that this type of consultation between client and architect, including the presentation of plans for other houses to the client, and coordination of the client's desires in the plans, is typical in the architectural profession, as well as standard practice at the Chirgotis firm. As further attested to by Mr. Zito:

> We designed the structure. We incorporated the Meltzers' requirements, many specific details they had required in certain areas, bedrooms had nooks and crannies that would accommodate specific furniture. They had specific window requirements. They had little thumbnail sketches that they afforded us as to location of lighting fixtures in certain rooms and switching thereof. That type of input. We worked with them hand-in-hand. But no, we didn't scribe the building, no. (T. 3.46, 22 to T. 3.47, 5).[22]

The Chirgotis firm, by fixing the ideas for the Meltzer home in a tangible medium, "created" those plans, for pursuant to 17 U.S.C. § 101, a "work" is "created" when "it is fixed in a copy . . . for the first time." It logically follows, then, that the Chirgotis firm is the author of these plans for the purpose of copyright interests. In contrast, ideas are not, as a matter of law, copyrightable. *Mazer v. Stein*, 347 U.S. 201, 217–18, 74 S.Ct. 460, 470–71, 98 L.Ed. 630 (1954); *Hoehling v. Universal Studies, Inc.*, 618 F.2d 972, 978 (2d Cir.), *cert. denied*, 449 U.S. 841, 101 S.Ct. 121, 66 L.Ed.2d 49 (1980). The ideas and sketches contributed by plaintiff do not sufficiently constitute fixed expressions of ideas; therefore, plaintiff is not the "creator" of the plans for his house for copyright purposes. Without authorship, the *sine que non* of copyright, plaintiff has no cause of action.

Nor can the plaintiff be considered a "joint author" of the plans with the Chirgotis firm. Under the 1976 Act, a joint work is one "prepared by two or more authors with the intention that their contributions be merged into inseparable or interdependent parts of a unitary whole." 17 U.S.C. § 101.[23] Of course, this would be a fiction here, since plaintiff's failure to have "created" or "prepared" the work within the meaning of the statute bars his asserting a copyright interest even as a joint author of the plans.

For all of the foregoing reasons, this Court finds that plaintiff's claims of copyright infringement against each and every one of the defendants must be dismissed as a matter of law.[24]

---

21. Mrs. Gelvan testified that plaintiff was especially interested in the Chateau Gaye plan which Mr. Zito showed to him at their initial meeting and that the layout of the Meltzer home plans is virtually the same as that of the Chateau Gaye. (Tr. 4.58–21 to 59–21). In this regard, Mr. Zito testified that the "fenestration of the Meltzer house is a combination of the Chateau Gaye and Eastbrooke." (Tr. 3.47, 17 to 18).

22. In addition, Mr. Zito prepared the majority of the exterior design of the Meltzer home, and determined the pitch of the roof in consultation

with his client, Mr. Doran. (Tr. 3.47, 17 to 48, 4).

23. Each contributor to a joint work automatically acquires an undivided ownership in the entire work. *Pye v. Mitchell*, 574 F.2d 476 (9th Cir. 1978); 1 Nimmer on Copyright, *supra* § 6.03 at 6–6.

24. This decision renders irrelevant any discussion of the similarities and differences between the Meltzer and the Zoller plans, or indeed, a determination of any of the other issues raised by any party.

858

Judgment shall be entered against the plaintiff and in favor of the defendants, with costs. Defendants' third party claims are consequently moot.