**AITKEN, HAZEN, HOFFMAN, MILLER, P. C., a professional corporation, Plaintiff,**

v.

**EMPIRE CONSTRUCTION COMPANY, et al., Defendants.**

**No. CV80–L–156.**

United States District Court, D. Nebraska.

May 13, 1982.

Harold D. Robertson, Lincoln, Neb., for plaintiff.

Perry, Perry, Witthoff, Guthery, Haase & Gessford, Lincoln, Neb., for defendants Empire and Belmont.

Johnston, Barber & Wherry, Lincoln, Neb., for defendant King.

Robert R. Miller, Lincoln, Neb., for defendant Lincoln Lumber.

MEMORANDUM OF DECISION

URBOM, Chief Judge.

This is an action for damages brought by Aitken, Hazen, Hoffman, Miller, P. C., a

professional architectural and engineering firm, against Empire Construction Company, Belmont Construction Company, Lincoln Lumber Company, and William R. King, a professional engineer, alleging infringement of the plaintiff's copyright in a set of architectural drawings which had been used in the construction of an apartment complex at 1820–22 Knox Street, Lincoln, Nebraska, by the defendants' copying the drawings and using the copies in the construction of an apartment complex at 1830–32 Knox Street. Jurisdiction of the court is conferred by 28 U.S.C. § 1338(a). Trial was held February 8, 9, 10 and 11, 1981, at Lincoln, Nebraska.

A summary of facts as found by the court follows; the facts will be discussed in greater detail in the text of this memorandum opinion.

Belmont is and since approximately 1954 has been engaged in the construction business in the Lincoln, Nebraska, area. Empire is a land developer in Lincoln. Karl Witt, the sole owner of Empire, is also the major stockholder and president of Belmont.

In 1962, Empire purchased a tract of land located at 1800 to 1900 Knox Street in Lincoln. Empire wished to develop this tract by subdividing it and building apartment complexes on the subdivided parcels. Thus, in November of 1977, Empire employed Belmont to construct a multi-unit apartment complex on the Knox Street property. In this same month, Mr. Witt, acting on behalf of Empire and Belmont, engaged the plaintiff to provide architectural services in developing the apartment complex. Belmont had contracted with the plaintiff in connection with previous projects, sometimes from the initial design stage and other times only to approve final design plans prepared by Belmont's draftsmen. In connection with the Knox Street project, Belmont decided to engage the plaintiff to design the apartment complex from the initial through the final design stages. The parties' agreement was entirely oral, and there was no discussion as to copyright ownership of the plans to be created.

It was decided in late November or early December that the apartment complex to be designed by the plaintiff would be located on parcel No. 3 of the subdivision, or by street address, 1820–22 Knox Street. Parcels numbered 1, 2 and 4 were to remain vacant for the time being. However, it was contemplated that another apartment complex would be built on parcel No. 2 (1830–32 Knox Street) in the future, and a common driveway for these two complexes was to be included in the plaintiff's design plans.

During the development of the architectural plans by the plaintiff there were several meetings between the parties to discuss the design of the complex. At the initial meetings Belmont communicated to the plaintiff through sketches and verbal descriptions its general ideas as to the type of apartment complex it intended to build, indicating that the complex should have a brick exterior, entrance by balconies rather than interior corridors, and a fireplace in each unit. It was also indicated that the design features of the apartment complex, and specifically the balconies, fireplaces and chimneys, should be similar to those in certain other apartment complexes designed and built by Belmont. Belmont supplied the plaintiff with the necessary information as to the brand and type of plumbing fixtures, kitchen cabinets, windows, and fireplace liners which it intended to use in the apartment complex. As a result of these discussions, the preliminary drawings for the roof, floor system and footings were revised.

The preliminary plans for the apartment complex, consisting of twenty sheets, were completed in early February of 1978 and reproduced by the plaintiff in a set of blueprints. Eighteen sets of the blueprints were delivered to Belmont; the plaintiff, in accord with its normal practice, retained possession of the original drawings. At the time the blueprints were delivered to Belmont, the plaintiff had not registered its copyright in the architectural plans and none of the sheets contained a "copyright," "c," or other notation of the copyright ownership of the plaintiff.

On February 10, 1978, two sets of blueprints were filed with the City of Lincoln Code Administration Department, and a building permit was later issued to Belmont for the construction of a 22-unit apartment complex at 1820–22 Knox Street. Using the plans prepared by the plaintiff, Belmont completed construction of the complex at this site in 1979. Empire paid Belmont for the construction and then sold the 22-unit complex to Amwest Properties, Inc., a Washington State corporation.

The total amount paid by Belmont for the preparation of the architectural plans by the plaintiff was $13,440.93. The bills for the plaintiff's architectural services were on an hourly rate basis and were paid by Belmont beginning in December, 1977, and continuing to late 1978.

In 1979 Empire employed Belmont to construct an apartment complex on parcel No. 2, 1830–32 Knox Street. Belmont, without the permission or knowledge of the plaintiff, copied the architectural plans prepared by the plaintiff for the 1820–22 Knox Street apartment complex to produce architectural plans for the construction of an apartment complex at 1830–32 Knox Street. These copies were taken to Lincoln Lumber Company, who had offered as a customer service to Belmont to have the plans reviewed and approved by a licensed engineer. Lincoln Lumber hired and paid William R. King to review the plans and place his seal on them. The copies were then returned to Belmont.

In December, 1979, Belmont delivered copies of the plans to the City of Lincoln Code Administration Department and obtained a building permit for construction of an apartment complex at 1830–32 Knox Street. Construction of the complex was completed in 1980 and thereafter Empire sold the land and the buildings at 1830–32 Knox Street, again, to Amwest Properties, Inc.

In early March, 1980, the plaintiff discovered that Belmont had copied the architectural plans for the 1820–22 Knox Street apartment complex to produce the architectural plans for the 1830–32 Knox Street apartment complex, and on March 29, 1980, the plaintiff hand-delivered to Belmont and Empire a bill in the amount of $35,973.00 for the plaintiff's "services rendered in connection with apartments at 1830 and 1832 Knox." Both Belmont and Empire denied any liability for the claimed services, and the plaintiff filed a mechanic's lien against the real estate at 1830–32 Knox Street in the same amount as the bill. The plaintiff's action in state court on the lien was dismissed for failure to establish an express or implied contract for the provision of services in connection with the 1830–32 project.

On April 25, 1980, the plaintiff placed notice of its copyright on the originals of the plans it had prepared. Prior to that date such notice had not appeared on those plans or any copy of them. On April 26, 1980, the plaintiff submitted its application for registration of copyright in the architectural plans for the 1820–22 Knox Street to the United States Copyright Office, and on April 29, 1980, the registration became effective. The plaintiff had not publicly asserted its copyright claim in the plans prior to April 26, 1980.

By letter dated May 12, 1980, the plaintiff notified each of the defendants and the city's code administration department of the plaintiff's copyright in the 1820–22 Knox Street apartment complex plans, and by a letter dated June 10, 1980, the plaintiff notified each of the defendants that it was infringing upon the plaintiff's copyright in the plans by "reproduction of derivative of same" without consent of the plaintiff.

On June 18, 1980, the plaintiff initiated this lawsuit under the Copyright Act of 1976, seeking damages for copyright infringement. The plaintiff has elected to seek statutory damages against the defendant King and actual damages and profits against the other defendants. The plaintiff also seeks costs, attorney's fees, and treble damages.

Prior to trial the plaintiff moved for summary judgment on its claim that Belmont infringed upon the plaintiff's copyright in the architectural plans for the 1820–22 Knox Street apartment complex. I con-

cluded in a memorandum and order dated January 26, 1982, filing 69, that the Copyright Act of 1976, rather than the Copyright Act of 1909, governs disposition of the plaintiff's statutory copyright claims, that the architectural plans in question are copyrightable, that the plans are not a commissioned work within the definition of a "work made for hire," that the plaintiff did not transfer copyright ownership in the plans by transferring copies of the plans to the defendants, and that the 1830–32 Knox Street plans are a reproduction of the 1820–22 Knox Street plans. To the extent that these issues are again raised by Belmont or any of the other defendants, I affirm my holdings as set forth in that memorandum and order.

The plaintiff contends that the defendants infringed upon the plaintiff's copyright by reproducing the architectural plans for the 1820–22 Knox Street apartment complex by preparing or assisting in preparing a derivative work from those plans and by reproducing copies of this derivative work, by distributing copies of the derivative works to subcontractors and building material suppliers, and by displaying the copyrighted works publicly by distributing a copy to the Lincoln Code Administration Department. I shall discuss first the plaintiff's copyright infringement claims against the defendants Belmont and Empire.

### 1. Belmont and Empire [1]

Belmont [2] contends that the plaintiff's copyright infringement claim against it must fail, because the plaintiff is not the sole author and owner of the copyright in the 1820–22 architectural plans. Belmont argues that it is the sole owner of copyright in the plans under the work-made-for-hire doctrine or, in the alternative, that it is coowner of the copyright, because it is a joint author of the plans. Should this court find that the plaintiff is the sole author and owner of copyright in the plans, Belmont contends, its use of the plans was a fair use or, if not a fair use, Belmont was an innocent infringer and therefore not subject to any liability for actual or statutory damages.

### A. Work Made for Hire

Section 201(b) of the Copyright Act as codified provides:

"In the case of a work made for hire, the employer or other person for whom the work was prepared is considered the author for purposes of this title, and, unless the parties have expressly agreed otherwise in a written instrument signed by them, owns all of the rights comprised in the copyright."

Section 101 defines a "work made for hire" as:

"(1) a work prepared by an employee within the scope of his or her employment; or

"(2) a work specially ordered or commissioned for use as a contribution to a collective work, as a part of a motion picture or other audiovisual work, as a translation, as a supplementary work, as a compilation, as an instructional text, as a test, as answer material for a test, or as an atlas, if the parties expressly agree in

---

1. The actions of the defendants Belmont and Empire are inextricably tangled. Karl Witt is the sole owner and president of Empire and eighty per cent owner and president of Belmont. Because Empire does not have a letterhead, Mr. Witt uses Belmont's stationery in conducting Empire business. Although the plaintiff was paid for its services in connection with the 1820–22 project with Belmont checks, the costs for the services were regarded as those of Empire and were carried on Empire's books. Furthermore, in a letter to Joseph Kean, who negotiated the sale of the 1830–32 project from Empire to Amwest, Mr. Witt indicated that the 1830–32 project would be built using the 1820–22 architectural plans, except in reverse. Therefore, even though it was Belmont's employees who copied the 1820–22 plans, Karl Witt, as president and owner of Empire, knew and approved of this activity. Empire is, therefore, liable as a contributory and vicarious infringer. See *Gershwin Publishing Corp. v. Columbia Artists Management, Inc.*, 443 F.2d 1159 (C.A. 2nd Cir. 1971).

2. Throughout the discussion of liability and actual damages, Belmont and Empire will be referred to as Belmont only.

a written instrument signed by them that the work shall be considered a work made for hire...."

While § 201(b) adopts one of the basic principles of American copyright law—that in the case of works for hire the employer, not the employee, is the author of the work; see H.R.Rep.No.94–1476, 94th Cong., 2d Sess. 121, reprinted in [1976] U.S.Code Cong. & Admin.News 5659, 5736—the definitional section constitutes a major revision in prior law with respect to works made for hire by independent contractors. See H.R. Rep.No.94–1476, 94th Cong., 2d Sess. 121, reprinted in [1976] U.S.Code Cong. & Admin.News 5659, 5737. Most court decisions interpreting the work-made-for-hire doctrine under the 1909 Act viewed an independent contractor in the same light as an employee. Thus, in the absence of an expressed intention to the contrary, copyright ownership was presumed to vest in the employer. *May v. Morganelli-Heumann & Assoc.*, 618 F.2d 1363, 1368–1369 (C.A. 9th Cir. 1980); *Brattleboro Publishing Co. v. Winmill Publishing Corp.*, 369 F.2d 565, 568 (C.A. 2nd Cir. 1966); 1 M. Nimmer, Nimmer on Copyright § 5.03[B][2][c] at 5–21 (1981) and cases cited therein.

The definitional section of the 1976 Copyright Act does not adopt this judicially created presumption but, instead, limits works made for hire by independent contractors to prescribed categories and only to those situations where the parties expressly agree in a signed written instrument that the work shall be considered a work made for hire. *May v. Morganelli-Heumann & Assoc.*, supra, at 1368, n. 4 (dicta); *Meltzer v. Zoller*, 520 F.Supp. 847, 854–855 (U.S.D.C. N.J. 1981); *Mister B. Textiles, Inc. v. Woodcrest Fabrics, Inc.*, 523 F.Supp. 21, Copyright L.Rep. (CCH) ¶ 25–213 (U.S.D.C. S.D.N.Y. 1981); 1 M. Nimmer, Nimmer on Copyright § 5.03[B][2][a] at 5–18 to 5–19 (1981). As previously noted, I determined in the January 26, 1982, memorandum and order on motion for summary judgment, filing 69, that the architectural plans in question are not a commissioned work as defined by § 101, because they do not fall within any of the listed categories and because there

was no written agreement between the parties that the plans should be considered a work made for hire. Thus, in order for the defendant Belmont to prevail on its claim that the 1820–22 plans were a work made for hire with copyright ownership vesting in Belmont, it is necessary that the relationship between Belmont and the plaintiff be an employer-employee relationship, as opposed to an employer-independent contractor relationship. If it is the former, copyright ownership will vest in Belmont; if it is the latter, copyright ownership will vest in the plaintiff.

Neither the Act nor the congressional committee reports define the term "employee." The definition of this term, however, has been the subject of discussion in numerous copyright cases decided prior to the current Act. The key factor in deciding whether an employment relationship exists between two parties is the employer's right to control and supervise the manner in which work is performed. *Epoch Producing Corporation v. Killiam Shows, Inc.*, 522 F.2d 737, 744 (C.A. 2nd Cir. 1975), cert. denied, 424 U.S. 955, 96 S.Ct. 1429, 47 L.Ed.2d 360 (1976); *Donaldson Publishing Co. v. Bregman, Vocco & Conn, Inc.*, 375 F.2d 639, 643 (C.A. 2nd Cir. 1967), cert. denied, 389 U.S. 1036, 88 S.Ct. 768, 19 L.Ed.2d 823 (1968); 1 M. Nimmer, Nimmer on Copyright § 5.03[B][1][a] at 5–12 (1981). This is, of course, merely a particular application of the common law test utilized to determine whether an individual is an employee or an independent contractor. See *Azad v. United States*, 388 F.2d 74 (C.A. 8th Cir. 1968) (stating the common law test).

■ The relationship between Belmont and the plaintiff is clearly that of employer and independent contractor. Belmont did not exercise and did not have the right to exercise the degree of control over the plaintiff's work necessary to render the plaintiff its employee. The plaintiff is a professional architectural and engineering firm; as such its work is governed by the standards of those two professions. See *Bartak v. Bell Galyardt & Wells, Inc.*, 629

F.2d 523, 529 (C.A. 8th Cir. 1980). See, also, The American Institute of Architect Code of Ethics and Professional Conduct, A1A Document J330 (Revised October 1, 1979); §§ 81–839 to 81–856, R.R.S.Neb. (Reissue 1976) (requiring all professional architects and engineers to be duly registered before practicing in the State of Nebraska, setting forth the qualifications for registration, and prescribing the legal obligations of such professionals); Rules and Regulations of the Nebraska State Board of Examiners for Professional Engineers and Architects. As stated by the Eighth Circuit Court of Appeals in *Azad v. United States,* supra, 388 F.2d at 77:

> "From the very nature of the services rendered by physicians and other professionals, it would be wholly unrealistic to suggest that an employer should undertake the task of controlling the manner in which the professional conducts his activities...."

While Belmont had the right to direct the result to be accomplished by the plaintiff's work—i.e., architectural plans for a multiplex apartment building with certain design features—it did not have the right to control and direct the detail and means by which that result was accomplished. Put simply, Belmont had the right to direct what should be done, but not how it should be done. Rather, it was the plaintiff's obligation, as a professional architectural and engineering firm, to use its independent professional knowledge and experience in designing the architectural plans in question.

The relationship of Belmont and the plaintiff is also devoid of other factors characteristic of an employer-employee relationship. The plaintiff furnished its own employees, drawing tools, and place to work. The plaintiff was not continuously or exclusively engaged by Belmont, but was engaged simultaneously by many clients and scheduled work on projects for these clients according to time priorities. Belmont had no control over when the plaintiff worked on its commissioned project or the means utilized when such work was performed.

Based on these facts, I conclude that the plaintiff was an independent contractor and not an employee of the defendant Belmont. This being so, under the Copyright Act of 1976, 17 U.S.C. § 201(b), copyright ownership vested in the plaintiff.[3]

### B. *Joint Work*

■ Under 17 U.S.C. § 201(a), "[c]opyright in a work protected under this title vests initially in the author or authors of the work. The authors of a joint work are coowners of copyright in the work." Section 101 of the Act defines a joint work as a "work prepared by two or more authors with the intention that their contributions be merged into inseparable or interdependent parts of a unitary whole." The legislative history to § 201(a) further amplifies the definition of a joint work:

> "... Under the definition of section 101, a work is 'joint' if the authors collaborated with each other, or if each of the authors prepared his or her contribution with the knowledge and intention that it would be merged with the contributions of other authors as 'inseparable or interdependent parts of a unitary whole.' The touchstone here is the intention, at the time the writing is done, that the parts be absorbed or combined into an integrated unit, although the parts themselves may be either 'inseparable' (as in the case of a

---

**3.** The resolution of this issue is the same under the Copyright Act of 1909. As stated, under case law interpreting that Act, courts presumed in the absence of an agreement to the contrary that the employer, rather than the independent contractor, was the copyright owner. This presumption was rebuttable, and evidence of custom or usage of the industry could establish an agreement to the contrary. *Meltzer v. Zoller,* 520 F.Supp. 847, 856 (U.S.D.C.N.J.1981); *May v. Morganelli-Heumann & Assoc.,* 618 F.2d 1363, 1368–1369 (C.A. 9th Cir. 1980). See, generally, 1 M. Nimmer, Nimmer on Copyright § 5.03[B][2][c] at 5–21, n. 61 (1981). As discussed, the plaintiff introduced persuasive evidence that it is the custom of the architectural profession that the architect retains ownership of plans, unless an express agreement to the contrary exists. Accordingly, it was the practice of the plaintiff to retain possession of all original tracings prepared by it, and Belmont was aware of this practice.

novel or painting) or 'interdependent' (as in the case of a motion picture, opera, or the words and music of a song)...." H.R.Rep.No.94–1476, 94th Cong., 2d Sess. 120, reprinted in [1976] U.S.Code Cong. & Admin.News 5659, 5736

Belmont contends that it was actively involved in the preparation of the architectural plans for the 1820–22 Knox Street apartment complex and that the plaintiff, by accepting Belmont's directions and involvement, indicated its intent that the architectural plans be a work of joint authorship. I find this contention to be without merit, for two reasons: (1) Belmont was not author of the design plans in question, and (2) there was no intention by either the plaintiff or Belmont to create a work of joint authorship.

### (1) Joint authorship

It is true that throughout the evolution of the 1820–22 architectural plans Belmont contributed ideas, directed certain changes be made, and exercised approval power at the completion of each stage of development of the plans. Such involvement by a client in the preparation of architectural plans is normally expected. See *Meltzer v. Zoller*, supra. Such involvement does not, however, ordinarily render the client an "author" of the architectural plans. In this case, Belmont directed that certain architectural features be incorporated into the architectural plans, but the plaintiff controlled how those ideas were incorporated. The only design idea which may be said to have originated in Belmont was the design by which the balconies were to be attached to the exterior walls of the apartment complex. However, even as to this design idea, it was the plaintiff's employees who prepared the actual design drawing incorporating the idea into the 1820–22 architectural plans. While there was testimony that Mr. Kassebaum drew sketches illustrating the bolt attachment of the balconies and testimony that the plaintiff's employees inspected other apartment complexes designed and built by Belmont, there was no testimony that the plaintiff actually copied the archi-

tectural plans prepared by Belmont which first included the balcony attachment design. Even assuming that Belmont's contribution of this idea to the plans in question was a contribution of authorship, Belmont's overall contribution to the plans cannot be said to be more than de minimus in nature.

### (2) Intention

As recognized in the committee reports discussing the Copyright Act of 1976, the touchstone in determining whether a work is of joint authorship is "the intention, at the time the writing is done, that the parts be absorbed or combined into an integrated unit." Such an intention is not found in the evidence before me.

Belmont contends that the basic design for the 1820–22 Knox Street apartment complex was that of other multiunit dwellings designed and built by Belmont. However, at the time these other complexes were designed, the idea of building an apartment complex at 1820–22 Knox Street had not yet been conceived. Thus, it cannot be said that Belmont prepared its design drawings with the knowledge and intent that the drawings would be merged with the contributions of the plaintiff into an integrated unit.

Furthermore, the deposition testimony of Mr. Witt indicates that it was Belmont's intention that the plaintiff, using the general guidelines provided by Belmont, design the apartment complex from the initial design stage through completion of the final drawings. Mr. Witt also testified that it was intended that the "general client and engineer relationship" exist between the plaintiff and Belmont. In this relationship, it is quite normal for the client to supply the engineer or architect with general design features which the client expects to be incorporated into the architectural plans and for the professional then to create the design drawings incorporating those features.

For the reasons above stated, I find that Belmont was not copyright owner of the architectural plans in question under either the work-made-for-hire or the joint-author-

ship provisions of the Copyright Act of 1976. This being so, I shall address Belmont's contentions that it is absolved from liability because its use of the plans constituted a "fair use" or because Belmont was an innocent infringer.

### C. Fair Use

■ Under the doctrine of fair use, as codified in § 107 of the Copyright Act of 1976, the use of a copyrighted work for purposes such as criticism, comment, news reporting, teaching, scholarship, or research is not a copyright infringement. The factors to be considered in determining whether the use of a work is a fair use include:

"(1) the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes;

"(2) the nature of the copyrighted work;

"(3) the amount and substantiality of the portion used in relation to the copyrighted work as a whole; and

"(4) the effect of the use upon the potential market for or value of the copyrighted work." 17 U.S.C. § 107

Applying these four factors to the evidence, it is readily apparent that Belmont's use of the plaintiff's plans was not a "fair use." Belmont's copy of the plaintiff's architectural plans was a "mirror image" of those plans and was used by Belmont solely for commercial purposes. No educational, scientific, or historical purposes were served by Belmont's use of the plaintiff's plans. The evidence before me indicates that there was no ready market for architectural plans for apartment complexes and that Belmont was the plaintiff's only potential market source. Thus, by copying the plaintiff's plans and using them for the same functional purpose as that which the plaintiff's plans would have been used for had Belmont not copied the plans, Belmont destroyed the plaintiff's potential market. This was not a fair use of the plans under copyright law.

### D. Innocent Infringer

■ Copyright notice in this case was omitted from the copies of the architectural plans filed with the city's code administration department and delivered to Belmont. While this omission does not affect the validity of the plaintiff's copyright,[4] it does affect the liability of any innocent infringers. Under § 405(b) of the Copyright Act of 1976, any person who innocently infringes a copyright in reliance upon an authorized copy from which the copyright notice has been omitted incurs no liability for actual or statutory damages for any infringing acts committed before receiving actual notice that registration for the work has been made, if such person proves that he or she was misled by the omission of notice. The section further provides that the court may allow or disallow recovery of any of the infringer's profits attributable to the infringement.

The evidence does not support Belmont's claim that it was misled by the plaintiff's omission of copyright notice from the plans delivered to Belmont. Belmont engaged the plaintiff in November of 1977 to design an apartment complex to be located on one of the parcels of a subdivided tract of land located at 1800 to 1900 Knox Street. By at least mid-December it was decided that the apartment complex would be built on parcel No. 3, designated 1820–22 Knox Street. While the plaintiff's architectural drawings were titled "Willow Haven 22–Unit Apartments 19th and Knox Streets" or, alternatively, "Willow Haven 11–Plex," it is clear from the grade and site plans that the apartment complex was specifically designed for location on parcel No. 3. Belmont was fully aware, of course, that the plans were being prepared for use in the construction of an apartment complex on that particular parcel of land; as Mr. Witt acknowledges, he did not request and did not receive the permission of the plaintiff

---

**4.** The plaintiff's omission of the prescribed copyright notice from the 1820–22 plans distributed to Empire, Belmont, and the city's code administration department was excused by § 405(a)(1) (omission from a relatively small number of copies) and § 405(a)(2) (registration within five years after publication without notice and reasonable effort to add notice).

to use the architectural plans in conjunction with construction on any site other than 1820–22 Knox Street.

At the time the parties orally contracted, there was no discussion about the ownership of the architectural plans which were to be prepared by the plaintiff. However, William Speece, a professional engineer and assistant professor in engineering mechanics, architecture and construction management, testified at the trial that it is the custom in the architectural profession that the architect retains ownership of plans, unless an express agreement to the contrary exists. This custom is set forth in both the "Standard Form of Agreement Between Owner and Architect," Article 8, AIA Document B141 (1977 ed.), and in the Rules and Regulations of the Nebraska State Board of Examiners for Professional Engineers and Architects, Rule IV E. 2 (effective August 2, 1980). Furthermore, it was the practice of the plaintiff to retain possession of all original plans and drawings prepared by it, and Belmont had been informed of this practice when in connection with both the 1820–22 project and previous projects it had requested the plaintiff's tracings for the purpose of producing additional sets of blueprints. The title block for the 1820–22 plans identified the plaintiff as author of the plans.

Finally, while Belmont contends that it paid for the plans in question, the evidence indicates otherwise. Each of the bills received by Belmont from the plaintiff was "for architectural and engineering *services* rendered" in connection with the above-mentioned project, plus reimbursable expenses. The personnel services for which Belmont paid were based on an hourly rate for each of the plaintiff's employees working on the project. Thus, it appears that Belmont paid for the plaintiff's services in preparing the plans, and not for the plans themselves. Furthermore, in estimating the cost of the apartment complex project for 1830–32 Knox Street, $4,000 was allowed for costs which would be incurred in having the plaintiff revise the architectural plans for 1820–22 Knox Street for use in connection with the 1830–32 project.

In view of the above-stated facts, I find that Belmont was not misled by the omission of copyright notice from the architectural plans prepared by the plaintiff and delivered to Belmont. The plans were specifically prepared for construction of an apartment complex at 1820–22 Knox Street. In accordance with the custom of the profession and its past practices, the plaintiff retained possession of the original tracings for the project; the plans themselves identified the plaintiff as author, and Belmont was billed and paid for the plaintiff's services in preparing the plans. I find that Belmont was aware that the plaintiff claimed ownership in the architectural plans in question and that Belmont's copying of those plans was not an innocent infringement.

## II. Lincoln Lumber and King

■ The plaintiff contends that the defendants Lincoln Lumber and William King are liable for infringement of its copyright in the 1820–22 plans, as either contributory or vicarious infringers, because Lincoln Lumber, at the request of Belmont, delivered the plans to Mr. King, and Mr. King, at the request of Lincoln Lumber, reviewed the plans and placed his seal on them, thereby making them a usable set of plans under the laws of the State of Nebraska.

### A. *Contributory Infringement*

Contributory infringement is defined as follows:

"... [O]ne who, with knowledge of the infringing activity, induces, causes or materially contributes to the infringing conduct of another, may be held liable as a 'contributory' infringer." *Gershwin Publishing Corp. v. Columbia Artists Management, Inc.*, 443 F.2d 1159, 1162 (C.A. 2nd Cir. 1971)

This theory of copyright infringement is predicated upon the common law doctrine that "one who knowingly participates or furthers a tortious act is jointly and severally liable with the prime tortfeasor." *Gershwin Publishing*, supra, 443 F.2d at

1162 (quoting *Screen Gems-Columbia Music, Inc. v. Mark-Fi Records, Inc.,* 256 F.Supp. 399, 403 (U.S.D.C. S.D.N.Y.1966)).

The defendants Lincoln Lumber and King had no knowledge, and no reason to know, of the infringing nature of the 1830–32 plans supplied to them by Belmont. It was common knowledge to those connected with the construction industry in Lincoln, Nebraska, that Belmont employed its own draftsmen and that these draftsmen prepared architectural plans which after being reviewed and approved by an architect or engineer were utilized for construction purposes. Indeed, the plaintiff had in its past business associations with Belmont reviewed and approved plans prepared by Belmont's draftsmen. Furthermore, the title block of the 1830–32 plans which were delivered to Lincoln Lumber and King identified Belmont Construction Company as the author of the plans. Therefore, even if Lincoln Lumber and King were considered to have "materially contributed" to the infringing conduct of Belmont, such contribution was made without knowledge of Belmont's infringing activity and cannot be considered a contributory infringement.

### B. *Vicarious Infringement*

■ While the roots of vicarious liability lie in the doctrine of respondeat superior—an employer is liable for the actions of his agent—an employer-employee relationship is not a necessary predicate for a finding of vicarious liability for copyright infringement. *Gershwin Publishing,* supra, 443 F.2d at 1162; *Universal City Studios v. Sony Corp. of America,* 480 F.Supp. 429, 461 (U.S.D.C. C.D.Cal.1979). Vicarious liability may be imposed when a party has "the right and ability to supervise the infringing activity and also has a direct financial interest in such activities." *Gershwin Publishing,* supra, at 1162. This is so, even though the party has no knowledge that copyright ownership is being impaired. *Id.; Shapiro, Bernstein & Co. v. H. L. Green Company,* 316 F.2d 304, 307 (C.A. 2nd Cir. 1963).

■ The facts of this case do not support a finding of vicarious liability on the part of either Lincoln Lumber or William King. The infringing act was Belmont's copying of the plaintiff's architectural plans for the 1820–22 apartment complex and the reproduction of those tracings into blueprints. Neither Lincoln Lumber nor Mr. King had the right or ability to supervise Belmont's copying of those plans. It is true that in order for the plans to be used for construction of an apartment complex in the State of Nebraska the plans had to be stamped with the seal of a registered professional engineer or architect (see § 81–851, R.R.S. Neb. (Reissue 1978)), and Lincoln Lumber and Mr. King took the necessary steps to provide Belmont with this seal. However, the seal was not a necessary predicate to copyright infringement. The infringement in this case was complete upon Belmont's tracing of the plaintiff's plans; neither Lincoln Lumber nor Mr. King had the capacity to prevent this tracing. Cf. *Shapiro, Bernstein & Co. v. H. L. Green Company,* supra, where the defendant department store retained under the terms of a concession agreement the ultimate right of supervision over the conduct of the primary infringer.

Also absent in this case is the second requirement of vicarious liability—a direct financial benefit. Neither Lincoln Lumber nor Mr. King received a percentage of Belmont's profits realized in the construction of the 1830–32 Knox Street apartment complex. William King received a flat fee of $95.00 for reviewing the architectural plans and placing his seal on them; Lincoln Lumber received compensation only for the supplies it sold to Belmont and nothing for its effort in procuring an engineer's seal. Lincoln Lumber would have realized the same profits for the materials supplied to Belmont, regardless of whether the plans for 1830–32 Knox were infringing or noninfringing. Cf. *Shapiro, Bernstein & Co. v. H. L. Green Company,* supra, where the defendant department store received as rental a percentage of the primary infringer's gross sales of pirated records.

### III.  Damages

### A.  *Actual Damages*

Under § 504(b) of the 1976 Act, a copyright owner is entitled to recover the actual

damages suffered by him as a result of an infringement. In this case the plaintiff is entitled to the fair market value of its architectural plans as revised for use in constructing the 1830–32 project. See *Nucor Corp. v. Tennessee Forging Steel Service, Inc.*, 513 F.2d 151, 153, n. 3 (C.A. 8th Cir. 1975) (infringers of plaintiff's common law copyright in architectural plans were liable to the plaintiff for the fair market value of the architectural plans).

As established at trial, there was no ready market for architectural plans for apartment complexes. There did exist, however, one potential market source for the 1820–22 architectural plans, and that source was Belmont. Thus, the amount Belmont would reasonably have paid to the plaintiff and the plaintiff would reasonably have expected to receive for the revision and use of the 1820–22 plans in conjunction with the 1830–32 project is the fair market value of those plans at the time of Belmont's infringement.

Belmont paid the plaintiff $13,440.93 for the plaintiff's services in preparing the architectural plans for use in the construction of the 1820–22 Knox Street apartment building. This charge was based on an hourly rate for each of the plaintiff's employees. However, by a letter dated November 24, 1978, the plaintiff notified Belmont and Empire that as of December 1, 1978, payment on any project would be based on a firm percentage rate.

In accordance with this notification, by a letter dated March 28, 1980, the plaintiff billed $35,973.00 for "services rendered in connection with apartments at 1830– and 1832 Knox" based upon an estimated construction cost of $479,643.00 and a percentage fee of 7.5 per cent. Mr. Hoffman, president of the plaintiff firm, testified that a percentage fee of 7.5 per cent was selected, because that was the percentage fee utilized by the plaintiff in connection with similar projects. However, in each of the exemplary contracts introduced by the plaintiff, the architectural services to be provided by the plaintiff for a percentage fee of 7.5 per cent entailed not only the preparation of design drawings and specifications but also the supervision of the contract bidding, supervision of construction, and payment of the contractor. These latter activities were not, of course, performed by the plaintiff in connection with the 1820–22 project and would not have been required in connection with the 1830–32 project, because the plaintiff had been engaged by both the owner (Empire) and the contractor (Belmont) of the projects. Furthermore, with respect to the 1830–32 project, the plaintiff would not have been required to develop the plans from the schematic design stage through the construction design stage, but would only have had to revise the final working drawings it had already prepared. I find, therefore, that a percentage fee of 7.5 per cent is inappropriate as a measure of the value of the use of the plaintiff's plans.

William Speece, the plaintiff's expert witness, estimated the fair market value of the architectural services reflected in the 1830–32 plans to be in the range of $23,750 to $37,500, based on a percentage fee of 4.75 to 7.5 per cent. However, on cross-examination Mr. Speece admitted that he was unaware, in making his estimation, that Belmont had paid only $13,440 for the preparation of the original set of plans. He stated that architects sometimes work on an hourly, rather than percentage, basis, and that the manner of computing fees on an hourly basis varies a great deal.

Even utilizing Mr. Speece's lowest estimated percentage base, the value of the 1830–32 plans is almost twice what Belmont paid for the design and use of the 1820–22 plans. It is inconceivable that Belmont would have been willing to pay or that the plaintiff would reasonably have expected to be paid $23,750 for the revision and use of plans for which Belmont originally paid only $13,440 to have developed from scratch. By preparing the original design plans for a price of $13,440 the plaintiff itself set the value of those plans. There is no evidence before me that the revised set of plans were of any greater value than the original set. Indeed, there being only one

potential buyer for the plans and the 1830–32 plans being a revised, rather than an original, set of plans, the 1830–32 plans may have been of less value. See *Edgar H. Wood Associates, Inc. v. Skene,* 347 Mass. 351, 197 N.E.2d 886, 896 (Mass.1964) ("Any value assigned [to the architectural plans] should reflect the fact that at the time of the conversion and the copying of the plans they had already been used in the Woburn apartment project and hence were not novel."). I find, therefore, that $13,440.93 is the highest reasonable value which can be assigned to the 1830–32 plans or their use.[5] See 3 M. Nimmer, Nimmer on Copyright § 14.02 at 14–8 (1981) (the price previously paid by the parties for the same or similar copyrighted materials may be accepted as evidence of actual damages).

In determining the actual damages suffered by the plaintiff as a result of the infringement of its copyright, there must be, of course, a deduction from the gross amount the plaintiff would have realized if Belmont had paid for use of the plans whatever costs the plaintiff would have incurred in revising those plans. Mr. Hoffman testified that it would have taken two to three eight-manhour days per sheet to trace the 1820–22 architectural plans to produce the 1830–32 architectural plans. He testified that the plaintiff firm would pay its employees from $5.00 to $15.00 an hour for this drafting work. The 1830–32 plans consist of eighteen sheets. Allowing 2.5 eight-manhour days per sheet at an average hourly rate of $10.00, it would have cost the plaintiff $3,600.00 to reproduce the 1820–22 plans. Deducting this figure from $13,-440.93, I find the actual damages sustained by the plaintiff to have been $9,840.93. Prejudgment interest on this amount is not authorized by the Copyright Act of 1976 and will not be allowed. See *Baldwin Cooke Co. v. Keith Clark Inc.,* 420 F.Supp. 404, 409 (U.S.D.C. N.D.Ill.1976).

### B. *Profits*

In addition to actual damages, the plaintiff is entitled to "any profits of the infringer that are attributable to the infringement and are not taken into account in computing the actual damages." 17 U.S.C. § 504(b). This section further provides that "[i]n establishing the infringer's profits, the copyright owner is required to present proof only of the infringer's gross revenues, and the infringer is required to prove his or her deductible expenses and the elements of profit attributable to factors other than the copyrighted work."

### (1) Belmont

In consideration for the construction of the apartment complex and garage located at 1830–32 Knox Street, Empire paid Belmont $512,569 ($511,250 contract price plus $1,309.00 in reimbursed expenses). Belmont introduced evidence showing that it incurred $451,540.56 in direct, deductible expenses, thus realizing a gross profit of $59,709.44 on the project. Belmont contends that it is entitled to deduct from the gross profit a proportion of its administrative and general overhead expenses by a formula which would reduce its gross profit to a net profit of $12,878.94.

The rule is that the overhead expenses which assist in the production of an infringing work are deductible from the gross profit of the infringer. *Wilke v. Santly Bros.,* 139 F.2d 264, 265 (C.A. 2nd Cir. 1943); *Smith v. Little, Brown & Co.,* 273 F.Supp. 870, 874 (U.S.D.C. S.D.N.Y. 1967), aff'd, 396 F.2d 150 (C.A. 2nd Cir. 1968). The burden is upon the defendant infringer to prove the actual expenditures for ordinary overhead and a fair method of allocating the overhead to the particular infringing activity in question. *Sammons*

---

5. It is conceivable that if Belmont had had the opportunity to negotiate with the plaintiff concerning the amount to be paid for the revision and use of the 1820–22 plans, Belmont may have paid less than the amount it paid for the design and use of the 1820–22 plans. However, it has been held that the defendant infringer "cannot expect to pay the same price in damages as it might have paid after freely negotiated bargaining, or there would be no reason scrupulously to obey the copyright law." *Iowa State University Research Foundation, Inc. v. American Broadcasting Cos.,* 475 F.Supp. 78, 83 (U.S.D.C.S.D.N.Y.1979).

*v. Colonial Press*, 126 F.2d 341, 349 (C.A. 1st Cir. 1942); *Stearns-Roger Mfg. Co. v. Ruth*, 87 F.2d 35, 41–42 (C.A. 10th Cir. 1936) (patent case). The defendant need not, however, prove that each item of overhead was used in connection with the infringing activity:

> "... The law requires no such minutiae, for it would make trials interminable. When appellant proved the actual expenditures for ordinary overhead, and a fair method of allocation, it carried its burden in the first instance. If, on cross-examination or otherwise, it appears that ordinary overhead is not chargeable, in whole or in part, to the infringing business, then a proper charge only should be made. But all allowance should not be denied because stenographers, bookkeepers, janitors, and presidents were not called to testify that they did perform specific tasks on this specific business. Courts and accountants resort to allocation to obviate this particular difficulty." *Stearns-Roger Mfg. Co. v. Ruth*, 87 F.2d at 41–42.

Cf. *Sammons v. Colonial Press*, supra, 126 F.2d at 349 (the burden is upon the defendant to show that each item of general expense or overhead assisted in the production of the infringement).

There is sufficient evidence in this case to establish that Belmont, in copying the plaintiff's architectural plans and constructing the apartment complex from those infringing plans, necessarily utilized the company's administrative personnel and its office facilities.

Belmont's calculated overhead figure of $249,881.00 consists of $217,636.00 in expenses, $3,384.00 in depreciation on office equipment and furniture, and $28,861.00 in interest on a capital funds loan which was not utilized on any particular project. The expenses are itemized by their nature and amount, with the following categories included: officers' salaries, other salaries, payroll taxes, advertising and promotion, auto and travel, rent, employee benefits, telephone, office supplies, general insurance, general taxes, utilities, professional services, bad debts, and other operating expenses. With the exception of the advertising and promotion expense of $4,000.00 and the bad debt expense of $11,621.00, these expenses are justifiable overhead expenses, a proportion of which are attributable to the 1830–32 project.

The advertising and promotion expense is not chargeable to the 1830–32 project, because Karl Witt, as sole owner of Empire, contracted with his own construction company (Karl Witt is majority stockholder of Belmont) for the construction of the 1830–32 project. Presumably, no advertising or promotion was responsible for the consummation of that contract. As to the bad debt expense, Mr. Witt testified on cross-examination that the bad debts were incurred on projects other than the 1830–32 project. The interest on the capital funds loan and the equipment and furniture depreciation are properly allocable overhead expenses. See *Sheldon v. Metro-Goldwyn Pictures Corp.*, 106 F.2d 45 (C.A. 2nd Cir. 1939), aff'd, 309 U.S. 390, 60 S.Ct. 681, 84 L.Ed. 825 (1940). Thus, the total overhead expense, a portion of which is allocable to the 1830–32 project, is $234,260.00.

In determining the proportion of the overhead expense allocable to the 1830–32 project, Belmont calculated what percentage the allocable overhead expenses were of the total net sales of the company, and then applied this percentage to the gross profit of $511,250.00 made on the 1830–32 project. This formula is a reasonably acceptable formula for allocating overhead expenses, except in one respect—Belmont utilized the net sale figure ($2,728,642.00), rather than the total income figure ($2,777,975.00), for the fiscal year in question. The total income figure includes gain on sale of equipment, management income, interest income and miscellaneous income. No explanation was given for the exclusion of this income, and there is nothing in the record to indicate that the company's overhead is not chargeable to it. It will be included, therefore, in the computation of allocable overhead. The $16,109.00 income loss incurred by Belmont's subsidiary will not be included

in computing Belmont's total income, because Belmont's overhead expense was not involved in generating that loss. Computed as described, Belmont's total income figure is $2,794,084.00.

Utilizing Belmont's proposed allocation formula, the overhead allocable to the 1830–32 project is $42,863.92.[6] The deduction of this figure from the gross profit of $59,709.44 realized on the 1830–32 project results in a net profit of $16,845.52.

(2) Empire

On July 14, 1980, Empire entered a written contract with Amwest Properties, Inc. for the sale of the land and buildings located at 1830–32 Knox Street. The total purchase price of $587,250.00 was to be paid as follows: $179,500.00 at the time of closing, $16,250.00 ninety days after closing and $391,500.00 plus interest in 360 monthly amortization installments of $4,407.40 each. Pursuant to paragraph 10 of that agreement, Amwest had the right to pay the monthly installments direct to State Federal Savings and Loan Association on Empire's outstanding real estate mortgage of $275,000.00. Pursuant to the agreement of the parties, this indebtedness was later refinanced for the benefit of Amwest to the amount of $391,000.00.

Empire introduced into evidence an accounting sheet listing the direct costs incurred by Empire in connection with the 1830–32 project. The costs consisted of (1) the amount paid to Belmont for the construction of the apartment complex and garage, (2) amounts paid in arranging the financing for the project, (3) the costs of the 1830–32 real estate, including carrying costs, (4) the amount of real estate taxes paid, and (5) the interest paid on the money borrowed by Empire for payment for the construction of the 1830–32 buildings.

The plaintiff contends that the total gross revenue which will be realized by Empire as a result of the sale of the 1830–32 project is not only the total purchase price of $587,250.00, but also the interest in the amount of $1,195,264.00 to be paid by Amwest on $391,500.00 of the purchase price—a total profit of $1,782,414.00. The evidence in this case established, however, that the interest payments paid by Amwest would not inure to the benefit of Empire, because both the principal and interest payments owing from Amwest would be paid to the savings and loan association as monthly installments on Empire's mortgage indebtedness of $391,000.00 plus interest incurred in connection with the 1830–32 project. Certainly, any interest incurred on amounts borrowed by Empire as working capital for the 1830–32 project was a direct expense deductible from Empire's gross profit on the project. *Sheldon v. Metro-Goldwyn Pictures Corp.*, 106 F.2d at 53 (where the court approved the master's deduction of interest upon a $300,000.00 loan taken for purposes of working capital). Because the interest owing from Amwest is, pursuant to the parties' agreement, being paid to the savings and loan association in satisfaction of the interest accruing on Empire's borrowing of working capital, Empire is not entitled to deduct the accruing interest as a direct cost of the project; because it has not taken such a deduction, it need not recognize the interest paid by Amwest as revenue. Therefore, the total profit realized by Empire on the project is $587,-250.00.

With the exception of the interest payments to Commonwealth Savings Company and the cost of the real estate, I find the expenses listed on Empire's accounting sheet to be deductible expenses. As will be discussed, the cost of parcel No. 2 is an expense which should be deducted from that proportion of the profit realized on the sale of the parcel, rather than from the profit realized on the sale of the constructed buildings. With respect to the interest payments to Commonwealth, the deposition of Karl Witt, introduced by the plaintiff, reveals that the $50,000.00 loan from Commonwealth involved more than just the 1830–32 project. Thus, the interest payments on this loan should not be borne

6. ($234,260 ÷ $2,794,084) × $511,250 = (.0838) × $511,520 = $42,863.92.

solely by the 1830–32 project. The defendant introduced no evidence as to how much of that loan was utilized for the 1830–32 project, and without such information it is impossible to calculate the amount of interest allocable to the project. Because Empire has failed to satisfy its burden of proof as to this element of direct cost, the deduction of $2,477.54 as costs relating to this loan will not be allowed. There is no evidence that the other direct costs listed on the accounting sheet were not wholly attributable to the 1830–32 project; they will therefore be allowed.

Empire also seeks to deduct from its profit on the 1830–32 project $46,830.50 in overhead expenses allocable to the project. As previously stated, it is Empire's burden to prove the actual expenditures for ordinary overhead and a fair method of allocation. *Stearns-Roger Mfg. Co. v. Ruth,* supra. Merely stating that $46,830.50 was the overhead expense allocable to this project does not satisfy this burden. The court (and the plaintiff, for purposes of cross-examination) is without any knowledge as to what items were included in the overhead figure or the specific amount of each of those items. Furthermore, the method of allocation utilized by Empire in computing this overhead allocation remains a mystery. This amount, therefore, will not be deducted from Empire's gross profit on the 1830–32 project. See *Sammons v. Colonial Press,* supra, 126 F.2d at 349.

Finally, Empire argues that the value of the land on which the 1830–32 apartment complex was built is $50,000.00 and that this part of the total purchase price for the 1830–32 real estate and buildings is, under § 504, an element of profit "attributable to factors other than the copyrighted work." I am inclined to agree. See *Sheldon v. Metro-Goldwyn Pictures Corp.,* 309 U.S. 390, 402, 60 S.Ct. 681, 685, 84 L.Ed. 825 (1940) (apportionment of profits is appropriate where the evidence is "sufficient to provide a fair basis of division so as to give the copyright proprietor all the profits that can be deemed to have resulted from the use of what belonged to him.").

Wayne Kubert, a Nebraska licensed real estate broker and appraiser, testified on behalf of Empire that the fair market value of parcel No. 2 in an undeveloped state as of July, 1980, was $50,000.00. This appraisal is supported by the fact that the contract entered into between Empire and Amwest on July 14, 1980, gave Amwest an option to purchase parcel No. 1, which was slightly smaller than parcel No. 2 and still undeveloped, for $50,050.00. Thus, there is sufficient evidence that $50,000.00 of the purchase price of $587,250.00 was attributable to the real estate, rather than to the buildings constructed thereon. I note, however, that the cost of this land—$14,552.17, is a direct expense which should be deducted from the profit on the real estate and not from the profit attributable to the buildings.

A calculation of the gross profits realized by Empire on the sale of the apartment complex—$587,250.00 minus $50,000.00 (profit attributable to the real estate), minus $560,917.95 (expenses excluding the cost of the land, payments to Commonwealth, and overhead)—reveals that Empire suffered a loss of $23,667.95, not a profit. That such a loss actually occurred is substantiated by the consolidated statement of income and retained earnings for Belmont and Empire, which shows that for the fiscal year in question Empire suffered a loss of $16,109.00. Because Empire realized no profits on the 1830–32 project, no profits can be recovered by the plaintiff.

### C. *Costs*

Pursuant to § 505 of the 1976 Act, the full costs of this action will be awarded to the plaintiff against the defendants Belmont and Empire.

### D. *Attorney's Fee*

■■■ Under § 505 of the 1976 Act, this court may award a reasonable attorney's fee to the prevailing party as a part of costs, except as otherwise provided by the Act. Section 412 prohibits an award of attorney's fee for:

"(1) any infringement of copyright in an unpublished work commenced before the effective date of its registration; or

.. 

"(2) any infringement of copyright commenced after first publication of the work and before the effective date of its registration, unless such registration is made within three months after the first publication of the work."

The defendants argue that under subsection (2) of this section this court is prohibited from awarding the plaintiff attorney's fees. The success of this argument depends upon a finding that the plaintiff's filing of the 1820–22 architectural plans with the city codes administration department on February 10, 1978, for purposes of obtaining a building permit and/or the distribution of the plans to Belmont with knowledge that the plans would be distributed to its subcontractors and suppliers constituted a publication of those plans. Such a finding is contrary to the majority of copyright cases addressing the issue of publication of architectural plans. See *Nucor Corp. v. Tennessee Forging Steel Service, Inc.*, 476 F.2d 386, 390–391 (C.A. 8th Cir. 1973) (neither distribution of plans to potential contractors and subcontractors for bidding purposes, permitting persons to view and inspect a building during and after construction, nor distribution of catalogs with photographs of the exterior of a building can be said to be publication of architectural plans); *Masterson v. McCroskie*, 194 Colo. 460, 573 P.2d 547 (1978) (distribution of architectural plans to contractor, subcontractors, building inspector and division developer does not constitute publication, even though no express restrictions were communicated to the recipients); *Seay v. Vialpando*, 567 P.2d 285 (Wyo.1977); *Krahmer v. Luing*, 127 N.J.Super. 270, 317 A.2d 96 (1974); *Shaw v. Williamsville Manor, Inc.*, 38 A.D.2d 442, 330 N.Y.S.2d 623 (App. Div.1972); *Edgar H. Wood Associates, Inc. v. Skene*, 347 Mass. 351, 197 N.E.2d 886 (1964); *Smith v. Paul*, 174 Cal.App.2d 744, 345 P.2d 546 (1959). Contra, *DeSilva Construction Corp. v. Herrald*, 213 F.Supp. 184 (U.S.D.C.M.D.Fla.1962) (filing of plans with building inspector is paramount to publication).

Based upon the facts of this case and the cited copyright cases, I find that there was no general publication of the 1820–22 architectural plans. Section 412(2), therefore, is inapplicable. However, because the 1820–22 plans were an unpublished work and because the defendants Belmont and Empire commenced their infringement of the plaintiff's copyright in these plans before April 29, 1980—the effective date of the plaintiff's registration of copyright—subsection (1) of § 412 prohibits an award of attorney's fee to the plaintiff.

### E. Treble Damages

The plaintiff's request for treble damages will be denied. First, there is no statutory authorization in the 1976 Act for such an award. Second, I do not find the defendants Belmont and Empire's infringing activities to be so outrageous or egregious as to justify such an award.

For the reasons stated in this memorandum of decision, the plaintiff's complaint against Lincoln Lumber and William R. King will be dismissed; Belmont and Empire are jointly and severally liable for the actual damages suffered by the plaintiff in the amount of $9,840.93 and for the costs of this action; and Belmont is liable for its profits in the amount of $16,845.52. A separate judgment will be entered.